Argued March 7, affirmed as modified April 4, 1951

WIGGINS *v.* HENDRICKSON ET UX.

229 P. 2d 652

*Robert A. Bennett* and *William F. Bernard,* both of Portland, argued the cause and filed a brief for appellant.

*Robert L. Recken* argued the cause for respondents. On the brief were Senn, Recken & Recken, of Portland.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

LATOURETTE, J.

This is a mechanic's lien foreclosure. Plaintiff, as contractor, and defendants, as owners, entered into a written contract wherein and whereby plaintiff engaged to erect a dwelling house for the defendants on their property in Portland, pursuant to plans and specifications, for the sum of $7,775.00. After the house was erected, defendants moved into the same, paying on the contract the sum of $6,972.76. Plaintiff filed a mechanic's lien for the balance of $812.24 and proceeded to foreclose the same. Defendants answered, and after making certain admissions and denials, pleaded a counterclaim wherein they alleged that the plaintiff breached the building contract in failing to comply with the plans and specifications in that he failed to install a proper flooring, wood siding, gutters, shingles and window balances, and also that he failed to do an adequate job of painting the exterior of the house. They then alleged that they were thereby damaged in the sum of $2,484.00, and after allowing plaintiff credit for $812.24, they sustained a net damage in the sum of $1,671.76, for which latter sum they prayed judgment against plaintiff. After a trial, the lower court dismissed plaintiff's complaint and

awarded defendants judgment in the sum of $1,257.76 on their counterclaim from which plaintiff appeals.

■ The first question raised by plaintiff is that the trial court had no authority to award judgment on the counterclaim and cites § 9-114, O.C.L.A., in support of his position. Said section follows:

> "The counterclaim of the defendant shall be one upon which a suit might be maintained by the defendant against the plaintiff in the suit; and in addition to the cases specified in the subdivisions of section 1-712, it is sufficient if it be connected with the subject of the suit."

We have considered the above statute on a number of occasions and have held that in order to plead a valid counterclaim in an equity suit, such counterclaim must contain matters of equitable cognizance. See *Hanna v. Hope,* 86 Or. 303, 310, 168 P. 618; *Gabel v. Armstrong,* 88 Or. 84, 89, 171 P. 190; *Hattrem v. Burdick et al.,* 138 Or. 660, 6 P. 2d 18.

In *Gabel v. Armstrong,* supra, a suit was brought to foreclose a chattel mortgage on a bakery. Amongst other defenses, defendant pleaded a counterclaim, setting up false and fraudulent representations inducing the sale of the bakery to the mortgagee, for which damages were asked. We said:

> "This portion of defendant's pleading is denominated a counterclaim. It is clear that if defendant had sued in assertion of the rights alleged, her remedy would have been at law: 39 Cyc. 1997. This affirmative answer is therefore not good as a counterclaim in equity within the provisions of Section 401, L. O. L."

In the case of *Hanna v. Hope,* supra, in a suit to quiet title, a counterclaim was interposed asking af-

firmative relief in the nature of unliquidated damages. We there held that the counterclaim was not proper and said: "The counterclaim on which a defendant may have affirmative relief in an equity suit must contain matters of equitable cognizance."

■ In the instant case, however, defendants have gone further and have endeavored to recover a money judgment in excess of plaintiff's claim. This, as pointed out, cannot be accomplished in a suit of the nature before us. Defendants' counterclaim contains matters of legal rather than of equitable cognizance. The counterclaim is predicated on a breach of contract wherein damages are sought. Equity is not involved. The judgment of the trial court awarding damages to the defendants on their counterclaim was erroneous.

We shall now turn to the question of whether or not plaintiff is entitled to foreclose his lien. Plaintiff, by the terms of the contract between the parties, agreed to construct a dwelling on defendants' property "in a good, substantial and workmanlike manner." The contract continues:

"And said party of the first part [plaintiff] also do agree to find, provide and furnish such materials of such kinds, quantities and descriptions as shall be fit, proper and sufficient for completing and finishing all the work or works mentioned in as far as necessary materials are available."

■ The burden of proof devolved upon the plaintiff to prove by a preponderance of the evidence, in order to create an obligation on the part of the defendants to pay the full contract price, a compliance with said contract. Plaintiff himself testified at length that he complied fully with the contract, and that where certain materials such as flooring, siding, gutters, shingles

and window balances were not available, he substituted other items in fulfillment of the contract. There was marked dispute between the parties and their witnesses as to the availability of the materials which were contracted for but not used. The testimony of plaintiff's witnesses went to the availability of materials during the time the house was being constructed.

■ The pivotal question, aside from the above, is whether or not plaintiff constructed the house "in a good, substantial and workmanlike manner." Plaintiff called no witnesses, other than himself, in chief, to support him in the above respect. Defendants, on the other hand, testified at length that plaintiff did not perform his work "in a good, substantial and workmanlike manner," pointing out in detail in what respects plaintiff was lax.

Defendants then called a Mr. Johnson who had been a carpenter for 32 years and had built a number of houses by day work on a plus cost basis. The following testimony was given:

"Q And what did you find with reference to the construction of the house? Would you say it was built in a good, workmanlike manner?

"A No, I can't say that it was.

"Q And in what way was the work defective?

"A Well, it was defective in most every respect."

Without detailing the remainder of his testimony, suffice it to say he testified that he found defective workmanship in the subflooring in the basement, likewise in the hardwood floor upstairs, cracks in the plaster caused by failure to install metal laths, poorly applied shingles, windows which would not open, a difference in the siding which was specified, failure

to cove the kitchen linoleum, leaks along the walls, and cracks in the attic "where the roof comes down over the outside of the house."

Defendants next called E. K. Streeter, a building contractor of 12 or 13 years' experience. The following question was propounded to him and answer given:

"Q  Well, what would you say, based upon your experience as a contractor, that that house was constructed in a good workmanlike manner?

"A  Well, there was portions of it that was all right, but there was larger portions that showed a vast amount of neglect, either in mechanical workmanship or supervision."

Witness Streeter corroborated Johnson's testimony in regard to defective workmanship in the construction of the dwelling house. In reply to the question, "What about the flooring?", he said: "Well, the floor, that is a pitiful situation. I have never seen anything like it before, nor since, and in the first place it wasn't a standard oak floor." Streeter's testimony with reference to the siding of the house follows:

"Well, to begin with the siding itself is the wrong type of siding for a home. It was used in certain homes and in certain places, but in general practice even during the shortages that type of siding wasn't used. They did, however, use a three-quarter inch fir siding but it had your two inch strips between each board so as to get a blind nailing, or nailing where this stuff is installed with direct face nailing and the result is if you have any expansion or contraction in the lumber it will check at a nail hole and allow water to come in whereas if it's blind nailed, well, irregardless of whether the wood splits it can never develop a leak on the surface. It was one thing that was very noticeable. Now, however, the fitting of these pieces

was neglected. Of course, carpenters weren't good carpenters, and weren't available at that time, but nevertheless there was a certain amount of neglect there even if they couldn't get competent mechanics."

Streeter's uncontroverted testimony was that it would cost $540.00 to replace the flooring, $800.00 for applying new siding, and $200.00 to replace the plaster, the total sum being in excess of the amount for which plaintiff contends in his complaint.

Defendants introduced into evidence certain photographs of the house showing cracked plaster and cracks in the floor of such proportions and so varied in size that from one to three silver dollars could be inserted in them.

As against the testimony of John Streeter, plaintiff called one J. W. Giselman, a hardwood floor contractor, who testified that the shrinkage in the hardwood floors was not due to improper workmanship but to moisture and heat.

The experienced and conscientious trial judge saw and heard the witnesses and personally inspected the dwelling house, and is in a much better position than we to appraise the conflicting testimony. However, we have carefully considered all the evidence in this case and agree with him that the weight of evidence preponderates in favor of the defendants and against the plaintiff. The decree dismissing the suit is affirmed with directions to set aside the judgment in favor of defendants on the counterclaim. Costs and disbursements in this court are awarded to plaintiff. Affirmed as modified.