Argued January 22, affirmed June 25, 1979

EMPIRE BUILDING SUPPLY, INC.,
*Appellant, Cross-Respondent,*
*v.*
EKO INVESTMENTS, INC., et al,
*Respondents, Cross-Appellants,*
FIRST FEDERAL SAVINGS & LOAN
ASSOCIATION OF KLAMATH FALLS,

*Respondent.*
(No. 77-349E, CA 11242)
596 P2d 593

Donald R. Crane, Klamath Falls, argued the cause for appellant, cross-respondent. With him on the the briefs was Crane & Bailey, Klamath Falls.

David Vandenberg, Klamath Falls, argued the cause and filed the brief for respondent, cross-appellant EKO Investments, Inc., an Oregon corporation.

William P. Brandsness, Klamath Falls, argued the cause and filed the brief for respondent, cross-appellant Michael Reeder, dba Kustom Drywall.

Respondent First Federal Savings & Loan Association of Klamath Falls waived appearance.

Before Schwab, Chief Judge, and Thornton, Lee and Gillette, Judges.

THORNTON, J.

## THORNTON, J.

Plaintiff, a building supply company, appeals a decree which (1) denied foreclosure of a materialman's lien against an improvement owned and constructed by defendant EKO Investments, Inc., hereinafter referred to as owner, and (2) found that plaintiff was entitled to a personal judgment against defendant Reeder, hereinafter referred to as contractor.[1] Contractor cross-appeals the personal judgment, contending that all transactions with plaintiff were usurious.[2]

The relevant facts are as follows. Owner and contractor entered into an agreement whereby contractor was to apply sheetrock and perform other services in an apartment complex being developed by owner. At the time he undertook these obligations, contractor was already indebted to plaintiff for materials supplied to other construction projects. Before submitting his bid on the EKO job, contractor telephoned plaintiff's president, one Dale Woods, to find out whether and at what price Woods would be willing to furnish materials for the EKO apartments despite contractor's unpaid bills. According to contractor's testimony at trial, he explained to Woods that the only way he would be able to repay the old account would be to complete new jobs such as the one proposed by owner. He expressed concern that, because the EKO contract contained a liquidated damage clause of $100 per day, he could not afford to be shut down by a lien foreclosure for moneys already owing. At the conclusion of this conversation, contractor allegedly agreed to purchase all the materials for the EKO project from plaintiff in exchange for Woods' promise to credit all

---

[1] Plaintiff combined in one complaint a suit to foreclose a materialman's lien against defendant EKO and Reeder, and an action designated as an action "on an open account" against defendant Reeder.

[2] Owner also raises the defense of usury on cross-appeal in regard to the transactions relating to the materials used in his improvement. However, owner is not an aggrieved party within the meaning of ORS 82.120(3), see *Portland Floor Co. v. Spaulding Logging Co.*, 64 Or 316, 320, 130 P 52 (1913), and we need not consider the merits of this contention.

moneys received from contractor against the cost of materials supplied for the EKO apartments; only if there was an amount in excess of that figure would there be any moneys applied to contractor's preexisting debt. In his testimony, Woods denied talking about segregating the billing and payment of the account for the EKO project and maintained that no separate accounting was kept.

When contractor began working for owner, plaintiff sent owner a notice of delivery of materials to be used in owner's improvement. *See* ORS 87.021. Upon receiving the notice, Lewis Erbes, secretary-treasurer of owner, contacted Woods and expressed his concern about a possible lien foreclosure against the apartment complex under construction. According to Erbes' testimony, he and Woods discussed contractor's problems in paying his past bills and owner's plans to make progress payments to contractor upon satisfactory completion of parts of his promised performance. He further stated that in order to safeguard plaintiff's interest in receiving payment for materials furnished for the EKO job, as well as to protect owner from any future lien foreclosure, he would monitor expenses and contact Woods whenever he paid contractor. Erbes had already secured contractor's assent to forward directly the initial progress payments to plaintiff and to request that plaintiff credit it against the cost of materials delivered to owner's apartments.

Erbes asserted that had he not obtained Woods' approval of this arrangement, he would have employed the customary means of avoiding materialman's liens, which was to have both the contractor and the materialman sign a joint lien-waiver before issuing a check made payable to both parties. Erbes claimed that he had at least seven telephone conversations with Woods during the three-month period that followed the beginning of work on the apartment complex, the topic of which was always contractor's account and the payments made to contractor. At least

[742]

three of those conversations preceded the receipt by plaintiff of three checks from contractor, the total of which exceeded the amount plaintiff claims under the lien as the reasonable value of the materials furnished to owner's project.

At trial, Woods did not dispute that the three checks were received but disclaimed that he and Erbes had discussed partial payments to relieve contractor's immediate financial difficulties or that Erbes had promised to advise him when such payments were made. Woods claimed that the only subject of conversation during the telephone calls was the money owner owed to contractor, and that he was unaware the three checks were in payment of the EKO job. Therefore, Woods followed his usual accounting procedure of crediting the payments to contractor's oldest outstanding bills.

The disagreement as to the method of accounting came to light when plaintiff contacted owner and informed him that he was worried about not getting paid for the materials used in owner's apartments. This announcement surprised owner, according to his testimony.

Plaintiff argues that in the absence of an agreement to waive the right to foreclose on a lien, *see Gray v. Jones*, 47 Or 40, 81 P 813 (1905), a materialman is not deprived of the right merely because an owner pays a contractor for materials furnished. ORS 87.021(2)(d). Plaintiff contends that there was no proof by a preponderance of the evidence that there was an agreement between owner and itself which constituted a waiver, and even if there had been such an agreement, there was insufficient evidence to conclude that owner had performed its part of the bargain so as to bar plaintiff from enforcing a lien. Plaintiff's argument misses the point of the trial court's findings, which in pertinent part provided:

"I further find by the greater weight of evidence that EKO and Empire Building Supply, through Mr.

Walker (sic), agreed to monitor the payments made by EKO to Reeder, that EKO did inform Empire Building Supply of the payments. Therefore, under ORS 87.021, (d) (sic), and *Bohn vs. Wilson*, 53 Or 490 and *Portland Floor Company vs. Spaulding Logging Company*, 64 Or 318, I find that Empire Building had knowledge that the checks from Reeder on August 25, 1976, September 29, 1976, and October 12, 1976, were from EKO. I am finding for the Defendants and against the plaintiff."

According to *Bohn v. Wilson*, 53 Or 490, 101 P2d 202 (1909), an agreement between an owner and a contractor to pay a materialman does not itself prevent the materialman from later seeking to foreclose a lien on the owner's property. In *Bohn,* the owner gave the contractor a check payable to him as part payment on a building contract. It was understood between them that the check was to be delivered to the materialman and credited against the cost of the materials used to build the owner's improvement. After endorsing the check, however, the contractor directed that it be applied against debts arising from materials supplied to a different construction project. The court's holding in favor of the materialman's right to foreclose was carefully limited by the fact that the materialman was completely unaware that the check was intended to be in payment of an account due from the owner to the materialman or that the check was received from the owner of any building which the contractor was engaged in constructing. 53 Or at 495.

In *Portland Floor Co. v. Spaulding Logging Co.*, 64 Or 316, 130 P 52 (1913), the court stated the general proposition that no creditor-debtor relationship exists between an owner and a materialman and that the owner's sole interest with respect to the materialman is that his improvement be charged only with the costs of materials used in its construction. 64 Or at 320. These cases indicate that regardless of any waiver of the right to foreclosure, when a materialman knows the source of funds for payments made by a contractor,

or that payment is intended to be applied against the cost of materials supplied to a particular project, he must "give credit where credit is due" in order to protect an owner from having his improvement exposed to a greater liability than was intended by the construction lien statutes. The question here is whether plaintiff had such knowledge.

Since a materialman's lien foreclosure is a suit in equity, *Wiggins v. Hendrickson*, 191 Or 285, 229 P2d 652 (1950), we review the record *de novo*. ORS 19.125(3). Even in equity proceedings, however, the credibility of witnesses is primarily a question for the trial court; the findings of the trial court, although not conclusive on appeal, are entitled to considerable weight. *E.g., Adamson v. Adamson*, 273 Or 382, 389, 541 P2d 460 (1975); *Bogle v. Paulson*, 185 Or 211, 228, 201 P2d 733 (1949).

It is evident that the determination of whether plaintiff had knowledge of the source of the three checks depends solely on the credibility of the witnesses who testified at the proceeding below. The trial judge chose to believe owner's testimony, perhaps as it was buttressed by contractor's, rather than plaintiff's. Our independent review of the record discloses nothing to persuade us not to defer to the trial judge's appraisal of the witnesses. [3]

Contractor's cross-appeal urges that all transactions reflected in his account with plaintiff were in violation of ORS ch 82, inasmuch as he was charged an annual percentage interest rate of 18 percent on balances more than 30 days old. In order to establish the defense of usury, a party must show that his dealings with plaintiff were in the nature of a "loan or use of money," and not a sale. *John Deere v. Delphia*, 266 Or 116, 511 P2d 386 (1973); *Lorber v. Marshall*,

---

[3] Since we find that plaintiff has no enforceable lien, it is unnecessary to entertain its claim that it enjoys priority over the mortgage security interests held by defendant First Federal Savings & Loan Association of Klamath Falls.

124 Or 272, 274, 264 P 438 (1928); *Coast Finance Corp. v. Powers F. Co.*, 105 Or 339, 344, 209 P 614, 24 ALR 855 (1922), *citing Beach v. Guaranty Sav. Assoc.*, 44 Or 530, 533, 76 P 16 (1904), and *Balfour v. Davis*, 14 Or 47, 52, 12 P 89 (1886); ORS 82.110, 81.220(2).

ORS 82.120(1) here provides:

> "No person, corporation or association, mutual or otherwise, shall receive in money, goods or things in action, or in any other manner, any greater sum or value for the loan or use of money than in this chapter described."

■ The record establishes that the transactions between plaintiff and contractor were not the loan of money but the sale of building materials and supplies evidenced by invoices containing the terms for payment. On receiving the items, defendant Reeder or his employes signed or received an invoice that contained the agreement set out in the margin.[4] This constitutes an interest-bearing commercial charge agreement rather than an open account. *See Purvis v. Kroner*, 18 Or 414, 23 P 260 (1890); Annotation, 1 ALR 1060 (1919).

Under the terms of the agreement plaintiff could have avoided the finance charge by paying his account within 30 days of the delivery of the goods. He did not do so. This is analogous to the two-price option approved in *John Deere.*

---

[4] "Credit sales subject to these terms: (A) 30 days net, which means each invoice should be paid within 30 Days of its date or a finance charge will be made on all non-deferred balances more than 30 days old which finance charge will be computed by a 'PERIODIC RATE' of 1 1/2 % per month for an 'ANNUAL PERCENTAGE RATE' of 18 % applied to amounts of balances shown on the statement as being more than 30 days old. The closing date of each statement period (known as the billing cycle) will be shown on each statement and to avoid a finance charge the 'amount due' is the last amount shown in the balance column of each statement and must be paid before the same statement date for the next month. (B) if suit is instituted to collect the sum due on this invoice, or portion thereof, or any sum or sums due on any book account between seller and buyer in which this sale is entered as an item, buyer shall pay such sum as shall be affixed by Court of competent jurisdiction as and for seller's reasonable attorney's fees, including fees on appeal."

We are satisfied that the instant transactions do not fall within the purview of our usury laws, even though the deferred price was expressed in terms of a finance charge of 1 1/2 percent per month on the unpaid balance. This appears to be the majority rule throughout this country.

Affirmed.