## MINTER-WILSON DRILLING COMPANY, INC.,
*Respondent,*

*v.*

## RICHINS et al,
*Appellants.*

(No. E-7451, CA 17866)

655 P2d 1060

Joan O'Neill, Portland, argued the cause for appellants. With her on the briefs was Black, Kendall, Tremaine, Boothe & Higgins, Portland.

William D. Cramer, Burns, argued the cause for respondent. With him on the brief was Cramer & Pinkerton, Burns.

BUTTLER, J.

Joseph, C. J., dissenting.

Warden, J., dissenting.

## BUTTLER, P. J.

Plaintiff commenced this action to foreclose a construction lien for labor performed and material supplied in well-drilling activities pursuant to two contracts. Defendants Paul H. Richins, Richtron, Inc. and Richtron Financial Corporation (Richtron Financial) appeal from a judgment against them and Merrill Glenn, foreclosing plaintiff's lien against real property in which they were alleged to claim an interest, the fee title of which is apparently in Glenn, who has not appealed. The appealing defendants, hereafter referred to collectively as defendants, assign the following errors: (1) failure to dismiss plaintiff's lien as untimely filed; (2) denial of their motion for dismissal on the grounds that plaintiff failed to show its corporate existence and lacked clean hands; (3) failure to limit the lien to the particular property benefitted by the work performed; (4) entry of judgment against defendant Richins and Richtron Financial, in the absence of proof that they had any interest in the land, and (5) awarding attorney fees in an excessive amount and in disregard of plaintiff's failure to give the required statutory notice to defendants. We modify the decree as hereafter set forth.

## BACKGROUND

On November 22, 1977, plaintiff, a well-drilling corporation based in Garden City, Kansas, entered into a written contract with "Catlow Valley Farms" to drill a minimum of ten irrigation wells and test holes on land purportedly under the control of Catlow in Harney County. The contract was signed by plaintiff and by "Catlow Valley Farms by Richtron, Inc., Paul H. Richins, President." Evidence concerning the legal status or existence of Catlow Valley Farms is sparse. Richins, the moving force behind the irrigation project, testified that Catlow is "the sum of seven different limited partnerships" based in Ogden, Utah. At the time the contract was signed, Catlow consisted of only four limited partnerships, but later, sometime in 1978, three others were added. The best we can determine from this record is that the Catlow name identified the group of limited partnerships involved in the project. All that is reasonably clear is that Richtron, Inc., was the general partner of each of the limited partnerships and, apparently,

of Catlow Valley Farms, which suggests that Catlow was also a limited partnership — if it was in existence.

Richins further testified that Catlow hired Richtron, Inc., to develop and manage its land in Harney County, described in the contracts between the parties as:,ju. "Land located in Sections 3, 4, 8, 9, & 10 T33S, R31E, W.M., Harney County, Oregon." Richins testified that the original owner of this property was Glenn, the nonappealing defendant, who sold it to defendant Richtron Financial, apparently retaining at least a security interest, perhaps a contract vendor's interest. He also testified that Richtron Financial had placed in escrow a deed to four of the Catlow Valley partnerships covering a portion of the property. There is no evidence of delivery of the deed or of an assignment, or attempted assignment, of a vendee's interest; in fact, we do not know whether there were viable grantees capable of taking an interest in the property. At trial, Glenn confirmed that he "sold" the property to "Richtron." Plaintiff's lien against the property names the owners as "Merrill Glenn, a/k/a Merrill H. Glenn, and/or Richtron Financial Corporation, a Utah Corporation."

The well-drilling contract provided that a payment was to be made on "completion" of each well. Completion of a well was contractually defined as "hole drilled, cased and gravel packed." The parties orally agreed that the sealing of the wells with cement was to be performed by the owner. A separate contract, dated December 14, 1977, and signed by E. C. Olsen for Richtron, Inc., provided for the installation of pumps in, and testing of, each well drilled in the various sections comprising the property described in the earlier contract.

Robert Minter, an officer of plaintiff, testified that prior to beginning work on the project, plaintiff obtained a certificate authorizing it to transact business in Oregon and hired a water well contractor and well driller, licensed in Oregon, to supervise the project. Plaintiff drilled a well in the northwest quarter of section 10 and another well in the northeast quarter of section 9 and received payment. Plaintiff also received payment for all test holes drilled throughout the property pursuant to the first contract. Plaintiff

then drilled and gravel-packed the two other wells, one in the southwest quarter of section 10 and another in the northwest quarter of section 9. Plaintiff was given two checks, dated December 19, 1977, and January 11, 1978, representing payment for that work; however, the checks were dishonored on presentment for want of sufficient funds. On January 7 or 8, 1978, plaintiff ceased drilling on the property because of the owner's failure to pay on completion of each well in accordance with the contract. Plaintiff continued to maintain a full crew for a period of two weeks after drilling had stopped, anticipating that defendants would obtain sufficient funds to continue the operation. Through April, 1978, plaintiff also kept its equipment and two men on the job site ready to complete the project.

On February 24, 1978, the state watermaster inspected the wells. At that time, it was determined that plaintiff did not have a licensed driller in charge. Plaintiff was informed that no further drilling would be permitted until that deficiency was corrected. On May 28, 1978, plaintiff filed a lien against all of the property described in the contract in which it claimed the sum of $199,143.66 to be due and owing. Prior to trial, the parties agreed that $90,747 could be credited to defendants for materials that could be returned to and used by plaintiff. At trial, Minter also testified that a $1,000 claim for setting and pulling two pumps should be reduced to $500, because plaintiff only set them; defendants pulled them. Thus, plaintiff's total lien claim was reduced to $97,896.66, of which $52,377.66 was labeled "cancellation costs." More will be said about that part of the claim later.

An order of default was entered against defendant Glenn for want of an appearance.[1] After trial, judgment was entered against all defendants in the amount of $104,290.30, plus costs and attorney fees of $22,967.38. The trial court entered a decree of foreclosure, ordering the sale of all of the property described in plaintiff's lien to satisfy the judgment against defendants. Prior to the sale, however, the sheriff was informed that defendant Richtron

---

[1] Glenn did not answer the complaint filed against him but did testify at the trial.

Financial had filed bankruptcy, and a stay[2] of the sale of its interest was demanded. The sheriff proceeded to sell all of the interests in the property, except that of Richtron Financial, to third parties. Ten days later, Glenn redeemed the property from the purchasers and, pursuant to ORS 18.430,[3] filed a notice of payment and demand for repayment from the other defendants.

## MOOTNESS

At the outset, plaintiff contends the case is moot because the full amount of the judgment has been paid. That proposition, however, is much too pat. The posture of this case is unusual, and no authorities have been cited to us that are dispositive of the question. The judgment here is against all defendants, one of whom, Glenn, defaulted and could not appeal. ORS 19.020. Notwithstanding the appeal by the other defendants, the judgment against all of the defendants could be enforced in the absence of a supersedeas bond, ORS 19.040; in other words, the interest of all of the defendants in the real property could be sold on execution. That procedure was followed here, but the sheriff was notified of Richtron Financial's bankruptcy, so that defendant's interest was not sold.

Assuming, however, that other defendants had an interest in the property, as alleged, their interests were sold. If the judgment were reversed on appeal, those defendants would be entitled to recover from plaintiff the

---

[2] Although we have nothing more than the passing reference to Richtron Financial's bankruptcy, pursuant to ORAP 12.35 we have withheld this opinion pending advice as to the status of those proceedings. We are now informed that they have been dismissed.

[3] ORS 18.430 provides:

"When property liable to an execution against several persons is sold thereon, and more than a due proportion of the judgment is levied upon the property of one of them, or one of them pays, without a sale, more than his proportion, he may compel contribution from the others; and when a judgment is against several, and is upon an obligation or contract of one of them as security for another, and the surety pays the amount, or any part thereof, either by sale of his property or before sale, he may compel repayment from the principal. In such cases, the person so paying or contributing shall be entitled to the benefit of the judgment to enforce contribution or repayment, if within 30 days after his payment he files with the clerk of the court where the judgment was rendered, notice of his payment and claim to contribution or repayment; upon filing such notice, the clerk shall make an entry thereof in the margin of the docket where the judgment is entered."

proportionate amount it collected from the sale of their interests. That would be true even if the judgment against Glenn could not be affected by the disposition of the case on appeal, because the interest of each of the defendants was sold and, presumably, had a value that could be established. But as we point out below, this meager record supports only the conclusion that Glenn and Richtron Financial had an interest in the property and, because Richtron Financial's interest was not sold on execution, only Glenn's interest was sold. If only Glenn has been harmed directly by the sale of the property, and if the judgment cannot be modified as to him, and if Glenn has no pending claims against the appealing defendants, then the appeal would be moot, because there would be only abstract questions left to resolve. It is apparent that the question is a complex one that cannot be resolved as simply as either of the dissenting opinions would attempt to do.

■ ■ The collection of the judgment by execution sale pending appeal, *per se,* does not render the appeal moot. It is well established that payment of a judgment will not preclude an appeal unless it satisfactorily appears that the payment was voluntary, not coerced, and made with a view of settlement. *Cottrell et ux. v. Prier et ux.,* 191 Or 571, 231 P2d 788 (1951). Payment made to prevent a threatened execution sale is not a voluntary payment. *Housley et ux v. Linnton Plywood Ass'n.,* 210 Or 520, 311 P2d 432 (1957). Here, the judgment was actually paid by a third party when the property was sold on execution, not by any of the defendants. Clearly, it cannot be said that defendants voluntarily paid the judgment. Even if the redemption by Glenn may be treated as a payment of the judgment by him, it was involuntary, because it was done to prevent the loss of his property interest. Further, it is clear that the judgment was not paid with the authorization of the appealing defendants with a view toward settlement. Contrary to the view expressed by Judge Warden, the appeal is not moot solely because the judgment was paid by the levy of execution or the redemption by Glenn.

Another line of reasoning (that Judge Warden's dissent incorrectly blends with the satisfaction of the judgment) involves an analysis of whether our decision would resolve merely abstract questions without any practical

effect, *State ex rel Juv. Dept. v. Holland,* 290 Or 765, 767, 625 P2d 1318 (1981); if so, the appeal would be moot. To resolve the question of abstractness, the unusual posture of this case must be analyzed. The record establishes that Glenn has pursued his right to enforce contribution or repayment from the appealing defendants by filing a notice and claim pursuant to ORS 18.430. That proceeding is ancillary to the principal proceeding involved in the appeal. The extent of the rights and obligations of the parties in the ancillary proceeding depend on the outcome of the appeal. Nevertheless, if the judgment against Glenn is not subject to reversal or modification on appeal by the other defendants, the question arises as to what the effect would be on Glenn's rights against the appealing defendants if we reverse or modify the judgment from which he has not appealed. If it would have no effect, the questions presented would appear to be abstract.

The thought that a reduction in the amount of the judgment on the lien against the defendants, who are personally responsible for payment of the money, benefits defendant Glenn, who did not enter an appearance, ought not to occasion the offense and alarm expressed in the Chief Judge's dissent. A defaulting party is not, by reason of his default, subject to punitive treatment or judicial vindictiveness. A more dispassionate analysis of the problem demonstrates that there is not only no reason to be offended by that result, but that it is one contemplated by ORS 19.130(1).

To begin with, Glenn was not a necessary party defendant in this suit to enforce a lien. ORS 87.060(6), so far as relevant, provides:

"* * * In such suits [to enforce a lien], *all persons personally liable,* and all lienholders whose claims have been filed for record under the provisions of ORS 87.035, *shall,* and *all other persons interested* in the matter in controversy, or *in the property sought to be charged with the lien, may* be made parties; but persons not made parties are not bound by the proceedings. * * *" (Emphasis supplied.)

Glenn is not personally liable for the obligations incurred by the other defendants in contracting with the plaintiff for the well-drilling, the subject of this suit. The proceeding

could have gone to judgment without Glenn's being a party; the only purpose in joining him as a party defendant was to submit his interest in the real property to the lien of the judgment.

At least some of the defendants, other than Glenn, were personally obligated for the payment of the labor and materials involved in the well-drilling, and with respect to them, plaintiff was entitled to a personal judgment, in addition to the decree of foreclosure and sale, the same "as in the case of an ordinary decree for the recovery of money." ORS 88.010. If the interest in the real property against which foreclosure is decreed does not sell on execution for an amount sufficient to satisfy the decree, the sum remaining unsatisfied under the decree may be enforced by execution as in ordinary cases, that is, against the property of the defendants, other than Glenn. ORS 88.060(2).

Essentially, the proceedings against Glenn, or, more accurately, against his interest in the property, are *in rem,* or at least *quasi in rem.* Only his interest in the real property is subject to the lien incurred by the other defendants as determined by the amount of that judgment. If, as here, the defendants who are personally obligated on the judgment succeed on appeal in reducing the amount of that judgment, Glenn's interest in the real property is subject only to the reduced amount of the judgment. That result should offend no one.

The Chief Judge states in his dissent that he is "reasonably certain" that ORS 19.130 "was not intended to provide a means to benefit a non-appealing party such as Glenn." That is an odd statement, indeed, given the fact that the relevant language of the statute specifically applies to "parties not joining in the appeal." The controlling statutory provision is subsection (1) of ORS 19.130, which provides, *in toto:*

> "(1) Upon an appeal, the court to which the appeal is made may affirm, reverse or modify the judgment or part thereof appealed from as to any or all of the parties joining in the appeal, and *may include* in such decision any or all of the *parties not joining in the appeal,* except a codefendant of the appellant against whom a several judgment might have been given in the court below; and may if

necessary and proper, order a new trial." (Emphasis supplied.)

That dissent goes on to state that a several judgment could have been given in the court below against Glenn, because, the dissent says, if Glenn's codefendants had settled with Minter-Wilson, a several judgment could have been entered against Glenn.

From what has been said above, it seems apparent that no judgment could have been entered against Glenn under those circumstances, which, in any event, are not present here. He is not personally obligated to the plaintiff. If no judgment were entered against the defendants who are personally liable to the plaintiff (as would be the case if they settled with plaintiff), no decree of foreclosure could have been entered. *That* proceeding would be moot. This one, however, is not.

■        Accordingly, our decision on appeal may affect the judgment as to all of the defendants, including Glenn and, therefore, may also affect the rights of Glenn against the plaintiff and the rights and obligations of Glenn and the appealing defendants *inter sese*. The questions are not abstract, the appeal is not moot and the appellants are entitled to a resolution of the merits of their appeal.

## THE MERITS

First, defendants argue that the lien was untimely filed. That issue, however, was not raised in the trial court and will not be considered for the first time on appeal. *State v. Kessler,* 289 Or 359, 371 n 17, 614 P2d 94 (1980); *Rafter Q Cattle v. Oregon Sun Ranch,* 51 Or App 27, 624 P2d 628, 52 Or App 719, 629 P2d 837, *rev den* 291 Or 708 (1981).

■        Next, defendants contend that their motion to dismiss should have been granted, because plaintiff failed to prove its corporate existence, and lacked "clean hands" because it failed to complete the work and the work that was done was unworkmanlike. Although neither plaintiff's certificate of incorporation nor its certificate of authority to transact business within the state was offered in evidence, Minter testified without objection or contradiction that plaintiff was a corporation authorized to do business in Oregon. That may not be much, but it is sufficient.

■ Further we find no evidence in the record that plaintiff lacked "clean hands." Defendants argue that plaintiff did not complete the project and that the work which was completed was not done in a workmanlike manner. Plaintiff, however, was justified in failing to complete the project, because it was not paid on completion of two wells, as required by the contract. Defendants contend that plaintiff was not paid because the work was not done in a workmanlike manner. Although we review *de novo, United Engine Parts v. Ried,* 283 Or 421, 428, 584 P2d 275 (1978); *Empire Building Supply v. EKO Investments,* 40 Or App 739, 745, 596 P2d 593 (1979); ORS 19.125(3), we nevertheless give considerable weight to the trial court's findings of fact, particularly when they involve credibility of witnesses. *Larson v. Trachsel,* 282 Or 247, 250, 577 P2d 928 (1978); *Skinner v. Keeley,* 47 Or App 751, 756, 615 P2d 382 (1980). Here the trial court did not believe defendant Richins' testimony that he did not pay plaintiff because the work on the project was poorly done. Rather, the court found,[4] and we agree, that defendants did not pay plaintiff because they did not have the money to do so. Prior to the filing of this action, plaintiff received no complaints from defendants concerning the quality of its work. The contention is without merit.

■ Defendants also complain that because plaintiff did not obtain a license in Oregon to contract to drill wells, it was not "entitled" to enter into the contract here. Although such licenses are necessary in Oregon, ORS 537.747(1)[5] and former ORS 537.756(1)[6] (repealed by Or Laws 1981, ch 416,

---

[4] In its memorandum opinion, the trial court stated:

"There is no question in the Court's mind but that the plaintiff did as it was obligated to do and that the defendants simply didn't pay as agreed. The Court was not impressed by the testimony of Mr. Richins as to the reasons his checks were bouncing all over the place since it was patently obvious that the reason that they bounced was because there was no money in the bank to cover them."

[5] ORS 537.747(1) provides:

"(1) No person shall advertise his services for construction or alteration of water wells, offer to, or enter into a contract with another person or public agency to construct or alter a well for such other person or cause any well construction or alteration to be performed under such a contract entered into by him unless he possesses a water well contractor's license in good standing issued by the Water Resources Director."

[6] Former ORS 537.756(1) provided:

§ 10), the state watermaster for the district in which the wells were drilled testified that a corporation would be in compliance with the licensing requirements if one of its employees possessed the proper licenses and supervised the drilling. At the time plaintiff began its Oregon operation, it hired Leeman White, a licensed well-drilling contractor in Oregon. White testified at trial that he worked for plaintiff for approximately two months and supervised the construction of the four wells drilled for defendants. Apparently, White was not in plaintiff's employ in February, 1978, when plaintiff was informed by the watermaster that its drilling had to be suspended until the licensing requirement was met.

■ The contention that plaintiff was not entitled to drill any of the wells because it failed to give the notice of intent to drill as required by ORS 537.762(1),[7] is not well taken. Although the evidence is not strong, it is sufficient to support our finding that the notice was given.

■ Defendants also contend that the two wells for which payment was not made are useless, because well logs were not filed with the Water Resources Director. Well logs, which set forth matters describing the construction of a well, are required to be filed after completion before water may be appropriated. The state watermaster, however, testified that a well log will not be accepted for filing until the well has been sealed. It was defendants' duty to seal the

---

"(1) No person shall construct or alter a well for another person unless the person operating the well drilling machine possesses a well drilling machine operator's license in good standing issued by the Water Resources Director or unless a licensed well drilling machine operator is present and is supervising the operation of the well drilling machine." (Repealed by Or Laws 1981, ch 416, § 10).

[7] ORS 537.762(1) provides:

"(1) Each person required to possess a water well contractor's license under ORS 537.747 who has entered into a contract to construct or cause to be constructed a well shall, before commencing the construction of the well, make a report to the Water Resources Director containing:

"(a) The name and post-office address of the owner of the proposed well.

"(b) The approximate location of the proposed well.

"(c) The proposed depth and diameter of the proposed well.

"(d) The proposed purpose or use of the ground water from the proposed well."

wells, and the two wells for which payment was not made were never sealed by defendants; thus, the well logs could not be filed. Defendants cannot now complain of omissions caused by their own failure to perform. We conclude that plaintiff complied with its obligations under the contract.

Defendants' third assignment of error is that the lien should have been limited to the area containing the two unpaid wells and the land necessary for their use and occupation. ORS 87.015(1) provides:

"(1) The site together with the land that may be required for the convenient use and occupation of the improvement constructed on the site, to be determined by the court at the time of the foreclosure of the lien, shall also be subject to the liens created under subsections (1), (4) and (5) of ORS 87.010 if, at the time of the commencement of the improvement, the person who caused the improvement to be constructed was the owner of that site and land. If the person owned less than a fee-simple estate in the site and land, then only his interest therein shall be subject to the lien."

Defendants first urge that the contract is severable, because it required payment on completion of each well. On that premise, they contend that the lien should be limited to the two quarter sections in which the wells were located as well as an area allowing ingress and egress, citing *Erne v. Goshen Veneer*, 249 Or 357, 437 P2d 479 (1968). That premise, however, is not sustainable.

■ The contract provides for the drilling of ten wells located in the

"Center of following 1/4 sections: NW 1/4 of 10, SW 1/4 of 10, NE 1/4 of 9, SE 1/4 of 9, NW 1/4 of 9, NE 1/4 of 8, SE 1/4 of 8, SW 1/4 of 9, NW 1/4 of 4, SW 1/4 of 4, others at owners [sic] discretion."

Minter testified that it would not have been economically feasible for plaintiff to enter into a severable contract here. The transportation cost alone for the huge drilling rig would have precluded plaintiff from contracting for the drilling of less than ten wells at the quoted price. We think it is clear that the contract was for the entire project and that progress payments were required at the time each well

was completed. That requirement does not make the contract severable. There is nothing in the contract to suggest that either party could terminate it after one or more wells were drilled; it covered the entire job, comprised of at least ten wells and test holes drilled throughout the entire property.

▪ Defendants also contend that the lien may attach only to those portions of the property that were benefitted by the two wells not paid for. That contention assumes severability of the contract, which we have rejected. The well-drilling contract, including the drilling of test holes, was intended to benefit all of the property described, the ownership of which had not been divided among the various limited partnerships. So far as plaintiff is concerned, the agreement was to drill test holes throughout the property and then to drill at least ten wells to permit irrigation circles to cover all of the property described. The fact that some of the work was paid for as required by the contract does not mean that the property immediately benefitted by the completed well is not lienable for work done on other portions of the property covered by the contract.

That brings us to the subject of the lawsuit — plaintiff's lien claim. Defendants contend that the filed lien claim contained non-lienable items. Those disputed items, designated as "cancellation costs" on the face of the lien, were separately set forth in an exhibit attached to the lien as follows:

"EXHIBIT 'A'

"Expenses incurred as a result of breach of contract by Owner.

| "# | 1 | 6,935.95 | Jan. for group 2 weeks |
|----|---|----------|------------------------|
| "# | 2 | 1,364.13 | Feb. Expense |
| "# | 3 | 1,825.53)<br>1,900.00) | March for Buster and<br>Jesse |
| "# | 4 | 1,800.00 | April for Dennis |
| "# | 5 | 10,000.00 | 1 Way Freight on Rig |
| "# | 6 | 500.00 | One test pumping |
| "# | 7 | 1,000.00 | Set and pull 2 new<br>pumps |

| | | | |
|---|---|---|---|
| "# | 8 | 13,612.05 | 15% Restocking charge on damage to material |
| "# | 9 | 6,160.00 | Freight charge 1.10 a loaded mile, 5600 miles |
| "# | 10 | 1,080.00 | 3 men misc. labor |
| "# | 11 | 5,700.00 | Misc. expense on trips, airplane, accounting, research & phone calls |
| "# | 12 | 500.00 | Misc. materials and welding on adapter for White well salvage |
| | | "$52,377.66" | |

In its memorandum opinion, the trial court found that all of the items claimed by plaintiff were lienable, but reduced the amounts claimed in items #5[8] and #7[9] by a total of $4,105.36. Defendants argue that, because all of those expenses were incurred after work on the improvement ceased (which, according to Minter, occurred on January 7 or 8, 1978), they were neither expended on nor became a part of the improvement and, therefore, are not lienable under ORS 87.010(1), which provides:

"(1) Any person performing labor upon, transporting or furnishing any material to be used in, or renting equipment used in the construction of any improvement shall have a lien upon the improvement for the labor, transportation or material furnished or equipment rented at the instance of the owner of the improvement or his construction agent."

---

[8] Item #5 was claimed by plaintiff as the estimated cost of returning to Kansas the drilling rig used in construction of the wells, a cost which would have been absorbed in the contract price had the project been completed. Minter testified that the actual cost of transporting the drilling rig *from* Kansas *to* Oregon was $6,394.64 and that the rig was still in Oregon at the time of trial. Because it was unclear from the testimony when or whether the rig would be returned *to* Kansas, the trial court intended to eliminate the return transportation cost of the rig. The record is very confusing on the point, and as a result of that confusion the court ended up allowing the sum of $6,394.64 as the cost of bringing the rig to Oregon to be used in the improvement. As we understand the record, that cost is not claimed by plaintiff in Item 5, but is included in the principal lien claim.

[9] Minter testified that this item should be reduced to $500 because plaintiff set, but did not pull, the pumps. That concession reduced the amount of "cancellation costs" claimed by plaintiff by $500.

Under that statute, a lien is limited to the cost of labor, transportation and furnishing material or renting equipment *used in the construction of an improvement.* Thus,

> " '[t]he right to a lien proceeds upon the theory that the work and material for which the lien is sought has increased the value of the [improvement] by becoming a part thereof; * * *.' " *Ward v. Town Tavern et al.,* 191 Or 1, 20, 228 P2d 216 (1951), citing *Patterson v. Gallagher,* 25 Or 227, 35 P 454 (1894).

Damages incurred as a result of the owner's breach of contract that do not relate to anything that became a part of the improvement do not add any value to the improvement and thus, although recoverable under general contract principles,[10] are not subject to the statutory lien.[11]

We agree that most of the Exhibit A claims are not lienable. Items #1 through #4[12] and #8 through #11[13]

---

[10] The complaint contained an allegation that the damages covered by Exhibit A to the lien resulted from defendants' breach of contract. Defendants moved to strike the complaint on the ground that it alleged two causes of action not separately stated. The motion was granted. The amended complaint contained essentially the same allegation, but defendants' renewed motion to strike that complaint was denied. Defendants also requested a jury trial on issues involving claims which were not lienable. They did not have a jury trial on those issues, presumably because the trial court found all claims lienable, and we do not decide the validity of the claims that we conclude are not lienable. Our disposition of the case is without prejudice to whatever residual claims plaintiff has for breach of contract.

[11] The same result was reached by the New York court under a similar lien statute:

> "The theory upon which the Lien Law grants a lien is that the lienor by his labor or materials or both has added to the value of the property upon which a lien is claimed. Damages caused by a breach of the * * * contract add nothing to the value of the premises upon which the building is being created and are not within the purview of the Lien Law." *Whritenour v. Colonial Homes Co.,* 209 App Div 676, 205 NYS 299 (1924).

[12] According to the testimony of Minter, items #1 through #4 were expenses for labor incurred after work on the project ceased after defendants breached the contract by nonpayment. Minter testified that he kept men on the job site in anticipation that the project would be completed. That expense, however, was a result of defendants' breach and cannot be said to have added to the value of the improvement.

[13] Minter testified that item #8 reflects the expenses incurred in rethreading and polishing the pumps pulled from the unfinished wells, an expense which, had the project been completed, would not have been incurred. Item #9 is the transportation cost of returning the unused materials to Kansas and item #11 is for expenses incurred *after* work on the project was halted. Although there was no testimony as to the character of item #10 because of its inclusion in Exhibit A, we assume that it was incurred after work ceased.

were incurred after work had stopped on the project and neither were used in the improvement nor increased the value of the improvement. Item #5 claims the cost of returning the drilling rig from Oregon to Kansas, which on this record is not lienable. *(See* n 8, *supra.)* Items #6,[14] #7 (reduced to $500, *see* n 9, *supra* ) and #12 *are* allowable, inasmuch as each appears to involve labor and materials used on the improvement before cessation of work.

Accordingly, of the $52,377.66 claimed in Exhibit A, we conclude that $1,500 is lienable and the balance represents claims for damages resulting from the breach of contract, which are not lienable. As a result of those conclusions, the total amount of plaintiff's lien is reduced to $57,519, and the judgment against all defendants, including Glenn, is modified to that amount, but without prejudice to any claims plaintiff may have for breach of contract.

■    Defendants' next contention is that judgment was erroneously entered against defendants Richins and Richtron Financial, because there was no evidence that either of those parties possessed any interest in the land. As we noted earlier, the record is murky at best. There is, however, testimony that Glenn "sold" the property to Richtron Financial; there is no documentation of that transaction. There is also testimony that Richtron Financial "sold" portions of that land to "the first four Catlow

---

[14] Defendants contend that because items #6 and #7 are the subject of a separate contract with plaintiff, a separate lien is necessary to claim these items. That contention was not made below; in any event, it is not well taken. In *Cons. Elec. v. Jepson Elec.,* 272 Or 376, 537 P2d 80 (1975), however, a materialman filed a single lien document against two pieces of property of different owners improved under separate contracts. The court held that, where the face of the lien indicated the amount attributable to each piece of property, the single document constituted a separate lien for amounts due on each separate piece of property. In so holding, the court noted:

"Lien law, for the sake of certainty, is subject to somewhat arbitrary rules. However, the modern trend is to dispense with arbitrary rules which have no demonstrable value in a particular factual situation. * * *" 272 Or at 380.

Here defendants received notice that the single lien covered the subject of both contracts: both contracts were attached to plaintiff's complaint and admitted in evidence at trial. Further, nothing on the face of the lien indicates that it is limited to only one of the contracts. Thus, we can see "no demonstrable value" in requiring plaintiff to file a separate lien for each contract.

Valley partnerships" by placing "a deed in escrow." There is no evidence as to what portions of the land were "sold," the names of the grantees or that the deed was delivered. On that less than perfect record, we conclude that Richtron Financial had an interest in the property and was a proper defendant in the foreclosure proceeding.

■        There is, however, nothing in the record to indicate that Richins personally had any interest in the land or that he was liable on either of the contracts. He signed the contracts as an officer of Richtron, Inc., the purported general partner of the purported limited partnerships. The corporate general partner was a proper party; the individual was not.[15] The judgment is modified to eliminate Richins individually as a judgment debtor.

■        Finally, defendants contend that the attorney fees awarded under ORS 87.060(4)[16] were excessive and that, in any event, they were not authorized because plaintiff failed to give defendants the required statutory notice. At trial, plaintiff's attorney informed the court, without objection from defendants' counsel, that the parties stipulated that the amount of attorney fees could be determined on affidavits. Plaintiff submitted an affidavit after trial itemizing the time expended on the case and estimating the time which would be spent on the foreclosure sale and redemption procedures, requesting a total fee of $25,000. Defendants filed an objection to the amount of the requested fees, but did not object to plaintiff's failure to give the notice required by ORS 87.039.[17] Given defendants' acquiescence

---

[15] Other questions raised here by defendants were not raised below and will not be considered.

[16] ORS 87.060(4) provides:

"(4) When notice of intention to commence suit to foreclose the lien has been given, pleaded and proven as provided for in ORS 87.057, the court, upon entering judgment for the lien claimant, shall allow as part of the costs all moneys paid for the filing or recording of the lien. In suits to enforce a lien created by ORS 87.010 the court shall allow as a part of the costs a reasonable amount as attorney fees to the prevailing party, except as provided in subsection (2) of ORS 87.039 and subsection (3) of ORS 87.057."

[17] ORS 87.039 provides:

"(1) A person filing a claim for a lien as provided by ORS 87.035 shall deliver to the owner a notice in writing that the claim has been filed. The notice shall be delivered not later than 20 days after the date of filing. Notice

in the procedure to be followed in determining the amount of attorney fees and their failure to raise the question of plaintiff's alleged failure to give the statutory notice, their complaints come too late. Although we agree that the fee allowed by the trial court ($22,800) was on the high side, we cannot say that the court exceeded the range of its discretion. The trial court is in a better position than are we to evaluate the services rendered by trial counsel.

We modify the judgment against all defendants, including Glenn, by reducing the amount thereof from $104,291.30 to $57,519 and by eliminating Richins as a judgment debtor. In all other respects the judgment is affirmed.

**JOSEPH, C. J.,** dissenting.

One remarkable result of the majority opinion is that a party (Glenn) against whom a default judgment was taken in a foreclosure action and who did not appeal and who has redeemed the property from execution wins a partial victory by being relieved from part of the joint judgment. Note, especially, that the foreclosure is not set aside; the only thing directly affected is the amount of the lien. I would be the last one to have any very firm idea of what the indirect effects of this decision will be — but one of them very likely will be to create more litigation, including actions by Glenn that in the usual scheme of things he should not be entitled to bring.

The majority's authority is ORS 19.130, quoted at 60 Or App at 710. In this instance, too, I am by no means sure what the statute really means, but I am reasonably certain that it was not intended to provide a means to *benefit* a non-appealing party such as Glenn. Be that as it may, by the very words of the statute this court has no authority to grant him relief, because he is "a co-defendant of the appellant against whom a several judgment *might* have been given in the court below * * *." (Emphasis supplied.) To see how *obvious the truth of that is, just imagine* that Glenn's appearing co-defendants had settled

delivered to the owner who received the delivery notice as provided by ORS 87.021 shall be deemed in compliance with the requirement of this subsection, unless the person giving notice has actual knowledge of changed ownership.

"(2) No costs, disbursements or attorney fees otherwise allowable as provided by ORS 87.060 shall be allowed to any party failing to comply with subsection (1) of this section."

with Minter-Wilson for less than the amount of the debt. Could not "a several judgment * * * have been given in the court below" against Glenn on the lien? Of course it could have. I do not believe that we should apply the statute to benefit a named defendant who did not choose to join in the litigation process but who testified at the trial and did not file a notice of appeal.

I therefore dissent. Given my interpretation of ORS 19.130, the dissent of Warden, J., is all the more obviously correct. The case is utterly moot, and I join in that dissent.

**WARDEN, J.,** dissenting.

Because I agree with the plaintiff's contention that this appeal has become moot, I respectfully dissent.

The facts relevant to the issue of mootness are adequately set out in the majority opinion.

"A case becomes moot for the purpose of an appeal, when because of a change of circumstances prior to appellate decision, the decision would resolve merely an abstract question without practical effect." *State ex rel Juv. Dept. v. Holland,* 290 Or 765, 767, 625 P2d 1318 (1981).

On June 6, 1980, plaintiff was paid all that it claimed was due from the proceeds of the sale of the property to third parties in the foreclosure proceeding. This appeal was pending on that date. The majority, in finding that the appeal is not moot, rely on *Cottrell et ux. v. Prier et ux,* 191 Or 571, 231 P2d 788 (1951), and *Housley et ux. v. Linnton Plywood Ass'n.,* 210 Or 520, 311 P2d 432 (1957), for the proposition that "payment of a judgment will not preclude an appeal unless it satisfactorily appears that the payment was voluntary, and not coerced, and made with a view of settlement." The rule, as stated in *Housley et ux v. Linnton Plywood Ass'n.,* 210 Or at 525, is as follows:

"When a judgment or decree is rendered against a party *his payment* of the sum awarded will not preclude him from maintaining an appeal unless it satisfactorily appears that the payment was voluntary, not coerced, and made with the view of settlement. *Cottrell v. Prier,* 191 Or 571, 573, 231 P2d 788." (Emphasis supplied.)

Stating the rule another way, it says that a party will be precluded from maintaining an appeal if payment is made

voluntarily and with the view of settlement, even when payment comes from the party's own funds. It does not say that voluntary payment by a third party preserves a judgment debtor's right of appeal.

In *Cottrell* the Supreme Court dismissed the appeal. It did so because the appellants had delivered the deed and other instruments, as ordered in the decree, and accepted payment of the balance due them in accordance with the decree. In effect, the Supreme Court found that the appellant's compliance with the decree was not coerced, but was voluntary. In *Housley,* payment was made by a third party pursuant to its contract with the appellant in order to prevent the threatened foreclosure sale of the mortgaged property. The sum paid by the third party was money withheld from sums due the appellant from the third party. Therefore, it was payment by the appellant. Because the agreement that determined the sum that the judgment creditor would accept in satisfaction of the judgment was made between the third party and the judgment creditor, the court found that payment was not made pursuant to a compromise agreed upon by the appellant and, therefore, it was not voluntary. In both *Cottrell* and *Housley,* payment was made by the party against whom judgment was rendered or from his funds.

The appellants in this case did not pay the sum awarded, or any part thereof. The judgment was paid from sums recovered on execution sale of the property from persons who are not parties to this law suit. The purchase was not made from funds of any defendant nor was it made on behalf of any of them. Neither can it be said that the purchasers were coerced into making payment. Defendant Glenn, who defaulted in the trial court and not a party to the appeal, did not pay the judgment, but merely redeemed from the purchasers at the execution sale. Defendants simply do not come within the rule relied on by the majority opinion.

Because a change of circumstances prior to appellate decision has made any decision merely a resolution of an abstract question without practical effect, this appeal is moot and should be dismissed. I respectfully dissent.

Joseph, CJ, Richardson and Rossman, JJ, join in this dissent.