ANCHOR CONCRETE COMPANY, A Corporation, Appellant,

v.

VICTOR SAVINGS & LOAN ASSOCIATION and John Gowin & Sons, Inc., Appellees.

No. 57161.

Supreme Court of Oklahoma.

May 24, 1983.

As Corrected May 31, 1983.

Harvey C. Carpenter and John W. Hunt, Tulsa, for appellant.

Weldon Stout, Kennedy, Kennedy, Wright & Stout, Muskogee, for appellees.

WILSON, Justice.

Defendants, Victor Savings & Loan (Owner) and John Gowin & Sons, Inc. (Contractor) entered into a contract for the grading, paving and curbing work in a new residential development near Tulsa, named Pleasant Valley Estates. The contract price was $270,418.30.

Contractor ordered concrete from Anchor Concrete Company (Subcontractor) with whom he had an open account. At the time of their agreement, the Contractor's account was in arrears. The Subcontractor also served as the indemnitor for the Contractor on this job. Total cost of the concrete on the project was $145,547.69.

During the construction process, Owner issued four checks naming Contractor and Subcontractor as joint payees. These four checks totaled $189,042.95. The parties stipulated that the joint payee checks were endorsed by Subcontractor to Contractor in exchange for Contractor's checks which were then issued to Subcontractor for less than the total amount owed Subcontractor for materials supplied on this project.

Subcontractor and Contractor agreed between themselves and without consultation with Owner that Subcontractor should only retain approximately 54% of these joint payee checks.[1] The trial court stated in the Findings of Fact that out of the four joint payee checks received, $100,902.16 was applied by Subcontractor in payment of materials furnished to the Pleasant Valley project. Originally the amount of the lien claimed was $43,069.98, but this was later reduced to $23,737.25.[2]

Subcontractor argues that it acted reasonably in retaining only portions of each joint payee check. This reasonableness it attempts to demonstrate in two ways. First, it suggests that had it demanded from the joint payee checks all the money that was owed to it for materials delivered to Contractor, a period of fifty-one days would have elapsed before any money was available to Contractor to pay his laborers and other expenses. Subcontractor argues

1. Trial Court's Findings of Fact, # 19, Record page 72:

"That John Gowin & Sons, Inc. and Anchor Concrete negotiated between themselves without notifying Victor Savings and Loan Association to determine the amount from the joint payee checks which would be credited to the Pleasant Valley Addition, John Gowin & Sons, Inc. Account."

2. The stipulation of facts contained the following statement:

"Plaintiff acknowledges and agrees that by reason of payments received herein by joint payee checks *and applied to other jobs* by John Gowin & Sons, Inc. and Anchor Concrete that plaintiff's lien claim should be reduced to the amount of $23,727.25." (*Emphasis added.*)

that avoiding such a situation was the only practical course. This argument does not acknowledge a payment of $36,000 made solely to Contractor before Subcontractor became involved in the project. Subcontractor did not know about the initial $36,000 payment, and further erroneously presumed that there were still due and owing sufficient funds from which he could receive the balance owed him. When the fact of such payment is taken into consideration, the above argument loses much of its impact. The argument perhaps is better advanced for the proposition that the Contractor misled the Subcontractor into allowing payments intended for the Subcontractor to be retained by the Contractor.

In a Texas case, *F & C Engineering v. Moore*, 300 S.W.2d 323 (Tex.App.1957), a similar situation arose. There, the materialman wrote the general contractor advising him that the subcontractor had an unpaid account with him of $10,982 and requesting payment by means of a joint payee check. Shortly thereafter, the general contractor sent an $8,000 joint payee check. The check was endorsed by the subcontractor to the materialman and the materialman issued its own check to the subcontractor in the amount of $2,000. The court stated at 325:

> It is conclusively established under the authorities, that a creditor who advances money to a subcontractor, even if the money is advanced to pay for labor and materials, is not entitled to the benefit of the liens given laborers and materialmen, nor to the benefit of the bonds required of general contractors to secure the payment for labor and materials.

The court also said,

> . . . . yet the materialman had within his control $8,000 which he could and should have applied thereon. He did not do so,

but, on the contrary, turned $2,000 of the money over to the subcontractor, on the representation of the contractor "that he wanted to use it to pay labor and miscellaneous obligations." It was not the province of the materialman to advance money to the subcontractor to pay "labor and miscellaneous obligations," nor to determine how much the subcontractor needed, if any, for that purpose. The materialman in this case having done so and having advanced to the subcontractor $2,000 by its own check, *the materialman became a simple money creditor of the subcontractor and thereby released both the general contractor and its surety as to said amount. Supra, at 326–327. (Emphasis ours).*

The position of the Subcontractor in the case at bar is analogous to that of the Materialman just described in *F & C Engineering.*

In addition to the perceived practical necessity of insuring a cash flow to the Contractor, Subcontractor offers as further justification for its failure to retain sufficient amounts to pay its claims the following statement:

> "It thus become (sic) quickly apparent that appellant occupied a fiduciary relationship to an enumerable (sic) field of laborers, craftsmen and materialmen. Though the exact number is uncertain, it is not difficult to foresee the number to be many, since the statutes' umbrella also covers unknown future lienors."

No other lienors or materialmen were mentioned by either party. We are not informed as to how the Contractor applied the funds released to him by Anchor. Even if there were other potential lien claimants Subcontractor misconstrues its duty to them. Subcontractor interprets provisions of the trust fund construction statutes[3] to

---

**3.** 42 O.S. 1981, §§ 152, 153 read as follows:

"§ 152. Proceeds of building or remodeling contracts, mortgages or warrant deeds as trust funds for payment of lienable claims

(1) The amount payable under any building or remodeling contract shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable

claims due and owing or to become due and owing by such contractors or subcontractors by reason of such building or remodeling contract.

(2) The monies received under any mortgage given for the purpose of construction or remodeling any structure shall upon receipt by the mortgagor be held as trust funds for

mandate that it has a fiduciary duty to see that all the laborers and craftsmen on the project get paid. However, the only obligation of the Subcontractor here, under the trust fund construction statutes, would be to apply proceeds Subcontractor receives *to its own valid lienable claims arising from the project which generated the proceeds, or to disburse proceeds it receives to pay valid lienable claims of parties with whom it has contracted.*

The issue in this case then is whether the Subcontractor, who has turned back part of the proceeds of the joint payee checks to the Contractor, is entitled to the benefit of a materialman's lien against the owner. The trial court found that the Subcontractor received, by means of the joint payee checks, payment in full for all materials furnished to the Pleasant Valley Estates Addition.[4] In determining this issue we are persuaded by the application of the joint payee check rule in *Post Bros. Const. Co. v. Yoder,* 20 Cal.3d 1, 569 P.2d 133, 141 Cal. Rptr. 28 (1977). There, the California Supreme Court deemed a materialman fully paid who had endorsed joint payee checks and held that the materialman could not recover on the owner's or contractor's surety bond. The California court held that "[w]hen a subcontractor and his materialman are joint payees, and no agreement exists with the owner or general contractor as to allocation of proceeds, the materialman by endorsing the check will be deemed to have received the money due him." (Citations omitted.) *Accord, F & C Engineering Co. v. Moore, supra.* In the *Post* case, it

was reasoned that "[i]nclusion of the materialman as payee makes clear that the maker of the check intends to discharge obligations owed the materialman." The court further offered the following rationale:

The materialman may protect himself by simply refusing to endorse the check until assured by escrow or other arrangement that he will recover his rightful share of the check. Because the materialman is positioned to demand immediate payment in exchange for his endorsement, the custom and use of joint checks is beneficial to materialmen.

Here, since the joint payee checks to the Contractor and Subcontractor totaled more than the Subcontractor's contract price, the Subcontractor should be deemed to have been paid in full and the Owner relieved of a lien by the Subcontractor. We therefore hold that when the Subcontractor received and endorsed the joint payee check and did not pay himself the total contract price, he waived the right to recover by foreclosure on a lien against the Owner. *See Westwood Bldg. Materials Co. v. Valdez,* 158 Cal.App.2d 107, 322 P.2d 79 (1958). The Subcontractor, knowing the payments received represented proceeds from the Pleasant Valley project, was obligated to apply payments against moneys due for concrete supplied for that project. *See Mountain Home Redi-Mix v. Conner Homes, Inc.,* 91 Idaho 612, 428 P.2d 744 (1967), and *Empire Bldg. Supply, Inc., v. EKO Investments,* 40 Or.App. 739, 596 P.2d 593 (1979). We observe that had there been any lienable claims which had not been paid by the

the payment of all valid lienable claims due and owing or to become due and owing by such mortgagor by reason of such building or remodeling contract.

(3) The amount received by any vendor of real property under a warranty deed shall, upon receipt by the vendor, be held as truct funds for the payment of all valid lienable claims due and owing or to become due and owing by such vendor or his predecessors in title by reason of any improvements made upon such property within four (4) months prior to the delivery of said deed."

"§ 153. Payment of lienable claims

(1) Such trust funds shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other

purpose until all lienable claims due and owing or to become due and owing shall have been paid.

(2) If the party receiving such money under Section 152 shall be a corporation, such corporation and its managing officers shall be liable for the proper application of such trust funds."

4. Trial Court's Findings of Fact, # 20, Record page 72:

"That Anchor Concrete received, by means of the four joint payee checks admitted into evidence as Defendant's Exhibits 2 through 5 inclusive, payment in full for all materials furnished to the Pleasant Valley Estates Addition to the City of Tulsa, Oklahoma."

Subcontractor for concrete work, the unpaid mechanics or materialmen could recover under 42 O.S.1981, § 143, against the Owner, and under the construction trust fund statutes against the Subcontractor.

Finally, Subcontractor's argument against the award of attorney's fees to Owner rests on Subcontractor's conviction that since it would prevail on appeal, the attorney's fees awarded in the court below could not stand. Since our decision is against Subcontractor, this argument fails.

The trial court's holdings are affirmed.

BARNES, C.J., and IRWIN, HODGES, LAVENDER, DOOLIN, HARGRAVE and OPALA, JJ., concur.

SIMMS, V.C.J., concurring specially.

SIMMS, Vice Chief Justice, concurring specially:

While I concur in the judgment pronounced by the majority, it is respectfully submitted the Trust Fund Construction Statutes have no relevancy to this case and all mention of them by the majority is *dicta.*