[L.A. No. 30750. Sept. 29, 1977.]

POST BROS. CONSTRUCTION CO., Plaintiff and Appellant, v.
CLARENCE YODER et al., Defendants and Respondents.

**Counsel**

Grant & Popovich and Irvin Grant for Plaintiff and Appellant.

Fulop, Rolston, Burns & McKittrick, Robert J. DeMarco and Kenneth B. Bley for Defendants and Respondents.

## OPINION

**CLARK, J.**—Plaintiff Post Bros. Construction Co. (Post), appeals from judgment denying foreclosure of mechanic's lien and recovery on a surety bond. We affirm the judgment.

In August 1973, defendant, Shapell Industries, Inc. (Shapell), owned subdivision Tract 8009 in Orange County. Shapell's subsidiary, a general contractor, subcontracted with defendant West Pac Constructors, Inc. (West Pac), for the latter to perform grading work on Tract 8009 for an estimated maximum price of $70,000. The ultimate price was to be fixed on a unit basis per hour and per cubic yard. West Pac in turn retained Post, a lessor of grading equipment, to supply the necessary equipment. The aggregate rental charges by Post to West Pac approximated $33,000. Post also rented equipment to West Pac for other jobs, some on Shapell property.

Shapell's subsidiary issued one check jointly naming West Pac and Post as payees and three other checks jointly to West Pac, Post and other materialmen who took part in grading Tract 8009. The subsidiary gave no instruction for division of the joint checks. The four checks totalled $54,000, the sum believed due on the contract. They were endorsed by each named payee, including Post, then deposited in West Pac's bank account.

The agreed statement of facts stipulates the four checks to West Pac, Post and the others were for work performed only on Tract 8009.

Pursuant to an ongoing "gentlemen's agreement" between Post and West Pac, West Pac would pay Post as soon as it received payment. Post kept a single ledger of invoices sent to West Pac. Although each invoice referred to a job site, they were not segregated by job sites. When West Pac sent a check to Post, the latter would credit West Pac's earliest unpaid invoices unless West Pac directed otherwise.

West Pac delivered four checks to Post exceeding $27,000, Post crediting $15,487.03 to Tract 8009 and $12,000 to other West Pac jobs. According to Post's books, $17,500 remained due for furnishing equipment on Tract 8009. Preliminary notice and mechanic's lien were filed.

Prior to commencement of work, Shapell as principal and Safeco Insurance Company of America as surety executed a labor and material

bond covering improvements on Tract 8009 pursuant to Business and Professions Code section 11612. The bond provides in part that if the principal, contractor or subcontractor fails to pay for materials or labor, the surety will pay the amount due.

The trial court determined Post failed to protect its own interest by not securing its share of the joint checks for application to its Tract 8009 account, that Post's claim against Shapell is fully paid, that Post is estopped from asserting mechanic's lien upon Tract 8009, and that there being no money due Post from Shapell, Safeco is not liable on its bond.[1]

The use of joint checks is well established by custom and practice in the construction industry. (See, e.g., Moss, *Joint Checks; Practices in the Construction Industry* (1968) 43 State Bar J. 242; Miller & Starr, Current Law of Cal. Real Estate (1975) § 10.36; Cal. Mechanic's Liens and Other Remedies (Cont.Ed.Bar 1972) §§ 6.38 and 7.29.)

When a subcontractor and his materialman are joint payees, and no agreement exists with the owner or general contractor as to allocation of proceeds, the materialman by endorsing the check will be deemed to have received the money due him. (*J. S. Schirm Co.* v. *Rollingwood Homes Co.* (1961) 56 Cal.2d 789, 795 [17 Cal.Rptr. 1, 366 P.2d 444]; *Bohannan Bros. Inc.* v. *Lo Jean Dev. Co.* (1969) 3 Cal.App.3d 200, 204-205 [82 Cal.Rptr. 922]; *Rodeffer Industries, Inc.* v. *Chambers Estates, Inc.* (1968) 263 Cal.App.2d 116, 118 [69 Cal.Rptr. 551]; *Re-Bar Contractors, Inc.* v. *City of Los Angeles* (1963) 219 Cal.App.2d 134, 136 [32 Cal.Rptr. 607]; *Westwood Bldg. Materials Co.* v. *Valdez* (1958) 158 Cal.App.2d 107, 109 et seq. [322 P.2d 79].) Inclusion of the materialman as payee makes clear that the maker of the check intends to discharge obligations owed the materialman.

" 'If it may reasonably be said . . . that a material dealer . . . could be so naive as to fail to understand the purpose and intention of an owner in making checks payable jointly to it and his subcontractor, [the materialman] was at least under the duty of inquiring . . . as to his intention with respect to the application of the funds represented by the checks. This [the materialman] failed to do, and it may not now be heard to say that respondent should bear the loss which it sustained as a result of its own imprudence.' " (*Re-Bar Contractors, Inc.* v. *City of Los Angeles, supra,* 219 Cal.App.2d 134, 136.)

---

[1]Post recovered a default judgment against West Pac, but the latter is insolvent.

The material man may protect himself by simply refusing to endorse the check until assured by escrow of other arrangement that he will recover his rightful share of the check. Because the materialman is positioned to demand immediate payment in exchange for his endorsement, the custom and use of joint checks is beneficial to materialmen.

The joint check rule is likewise beneficial to owner and general contractor. They have contracted with the subcontractor—not the materialman—and are usually unaware of the nature and size of the materialman's claim against the subcontractor. The joint check rule provides a simple yet expeditious method for owner and general contractor to pay their debts to the person with whom they have contracted while eliminating the risk the subcontractor will not pay the person with whom he has contracted.

While the above cited cases involve only two payees, the joint check rule logically applies when there are more than two. Each payee is well aware of the owner's or general contractor's intent to discharge his obligations throughout the construction pyramid. Post may not reasonably contend the joint check was executed to give the payees a right to divide the proceeds as they saw fit without regard to the owner's or general contractor's intent. Again, any payee may refuse to endorse unless assured his proper share of the proceeds. While division may become more burdensome as payees increase, disbursement can be accomplished by simple escrow.

■ Post contends the joint check rule should not apply when there are multiple job sites. However, the number of jobs should not change the materialman's need to determine his share of any joint check. When there is a single job and a joint check, the materialman, before he can determine his share, must determine whether all of the job is covered by the joint check or whether it is merely a progress payment. In short, his burden is to determine what the joint check is for. Performance of this burden will also establish which of the multiple jobs should be credited. As pointed out above, the materialman's failure to determine the owner's or contractor's intention as to the application of funds represented by the joint check precludes urging the loss caused by his imprudence should be borne by the owner or general contractor.

■ Post also urges it was free to allocate the funds received in accordance with Civil Code section 1479 because there were multiple projects. Under the section, proceeds of a payment are allocated in

accordance with the intention of the "debtor" if manifested, and if not manifested the "creditor" may allocate in any manner he chooses within a reasonable time.[2] However, it has been held that the statute has no application to joint check cases where the owner or general contractor is not the debtor of the materialman. (*Ewing Irrigation Products* v. *Rohnert Park* (1973) 29 Cal.App.3d 862, 866 [105 Cal.Rptr. 812].) By using a joint check, the owner has demonstrated his intent that the proceeds shall be divided among the payees to discharge obligations to them, and the code section is here inapplicable because it provides no method for division of the funds among the payees—providing a method of allocation only after division.

Claiming that the check's proceeds should be allocated in the manner followed by West Pac and it, Post relies on the statement in *J. S. Schirm Co.* v. *Rollingwood Homes Co., supra,* 56 Cal.2d 789, 795, that in the application of the proceeds of joint checks, " 'the question of whether a check is received in payment of a debt is one of fact depending on the intention of the parties.' " The court held in the immediately succeeding sentence that, because the joint checks were issued as to specifically listed lots, the payments were to be applied to those lots, and the owner could not properly claim that the checks also covered debts thereafter incurred as to other property. Thus, the specification was held to establish the maker's intent, and by endorsing the payees acknowledged their intent. Although the joint check rule will give way to an express or implied agreement of the maker and payees, in the instant case there is neither express nor implied mutual understanding of the maker and the payees, or specification on the checks to lots other than those liened.

---

[2]Civil Code section 1479 provides: "Where a debtor, under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows: [¶] One—If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied. [¶] Two—If no such application be then made, the creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance; except that if similar obligations were due to him both individually and as a trustee, he must, unless otherwise directed by the debtor, apply the performance to the extinction of all such obligations in equal proportion; and an application once made by the creditor cannot be rescinded without the consent of [the] debtor. [¶] Three—If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order; and, if there be more than one obligation of a particular class, to the extinction of all in that class, ratably: [¶] 1. Of interest due at the time of the performance. [¶] 2. Of principal due at that time. [¶] 3. Of the obligation earliest in date of maturity. [¶] 4. Of an obligation not secured by a lien or collateral undertaking. [¶] 5. Of an obligation secured by a lien or collateral undertaking."

**8**

■ Because the joint check is deemed payment to the materialman, as we have seen, it follows that the paid materialman may not recover on the owner's or contractor's surety bond. (See Civ. Code, § 2810 (surety is entitled to principal's defenses other than personal defenses unless assumed liability with knowledge of the defenses); § 2839 (performance exonerates surety).) To hold otherwise would mean that the principal would be the one ultimately liable, required to pay twice because a surety is entitled to reimbursement from its principal. (Civ. Code, § 2847.) To so hold would preclude effective use of joint checks in all cases where there is a surety bond, defeating the simple, speedy, and fair method of payment open to owner and contractor who wish to pay fully—once and only once—for labor and material in a manner offering protection to the materialman. Were we to now frustrate this established practice, the owner and general contractor, wishing to protect themselves against a possible defaulting subcontractor, would be required to either resort to slower, more complex methods of payment or abandon the subcontractor-materialman method of construction.

Pointing out that the bond provides payment when subcontractors fail to pay for material, Post reasons that even if it is deemed paid by the owner and contractor, it has not been paid by the subcontractor and thus may proceed on the bond. However, Post is deemed paid under the joint check rule as among itself, Shapell, and the principal on the bond, and the surety is entitled to his principal's defenses.

Post also relies in this connection on cases recognizing that, even though its lien may be extinguished, a materialman is permitted to proceed against the contractor's surety who has promised to pay all materialmen. (*Fraters Glass & Paint Co.* v. *Southwestern Construction Co.* (1927) 200 Cal. 688, 693 [254 P. 1097].) Liens may be terminated for a number of reasons, and termination is not the same as payment.

Post also relies on *Ferry* v. *Ohio Farmers Ins. Co.* (1963) 211 Cal.App.2d 651 [27 Cal.Rptr. 471]. There the owner used a joint check naming his contractor and a materialman as payees. It was held that the materialman's endorsement did not preclude action against the *contractor's* surety. However, that case expressly distinguished joint check cases like the instant one where the claimant seeks to recover from the maker of the joint check rather than the copayee or his surety. (211 Cal.App.2d at pp. 654-655.) ■ Under the joint check rule the maker of the check is deemed to have paid the materialman-payee; the rule does not deal with the rights between the copayees and their sureties.

The judgment is affirmed. Post conceded that should it fail to prevail on this appeal it was liable for reasonable attorney fees on appeal as requested. The remittitur shall authorize the trial court to award such fees.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., Manuel, J., and Jefferson, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.