SANDPIPER NORTH APARTMENTS, LTD., a limited partnership, et al., Plaintiff,

and

Chet Leonhardt, Jr., (Plaintiff) Appellee in No. 57,265 and Appellant, in No. 57,323,

v.

AMERICAN NATIONAL BANK AND TRUST COMPANY OF SHAWNEE, Shawnee, Oklahoma, a national banking corporation, (Defendant) Appellant in No. 57,265, Appellee in No. 57,323,

and

Midwest Engineering, Inc., a corporation, et al., Defendants.

Nos. 57265, 57323.

Supreme Court of Oklahoma.

April 10, 1984.

As Corrected April 17, 1984.

984

Gary F. Duckworth, Hastie & Kirschner, Oklahoma City, for American Nat. Bank and Trust Co. of Shawnee.

David Ingram, Ingram, Lewis & Basham, Shawnee, for Sandpiper North Apartments, Ltd. et al and Chet Leonhardt, Jr.

OPALA, Justice:

The questions to be decided on certiorari are: (1) May the construction trust fund doctrine of our statutory law, 42 O.S.1981 §§ 152 and 153, be invoked to impose liability for misapplied trust funds upon persons not specifically charged therein with fiduciary responsibility? (2) If the first question be answered in the affirmative, was the trial court correct in imposing liability for misapplied funds upon the subcontractor's lender-bank *qua* involuntary trustee? (3) Is there evidentiary support for the trial court's finding that trust funds were misapplied? (4) Was prejudgment interest recoverable? and (5) May the prevailing party be awarded counsel fee in a suit to enforce liability imposable by the statutory construction trust fund doctrine? Our answer is in the affirmative to the first, second and fifth questions and in the negative to the third and fourth.

Two Oklahoma limited partnerships, Sandpiper North Apartments, Ltd., and

Sandpiper South Apartments, Ltd. [Owners], were formed early in 1972 for the purpose of building two apartment complexes in Oklahoma City [Sandpiper projects]. Chet Leonhardt, Jr., Karroll Spence and Sidney Davidoff [referred to collectively as Contractor] became prime contractors for these projects. The Contractor then engaged Midwest Engineering, Inc., [referred to as Subcontractor or Midwest] to install heating, plumbing, air conditioning and utilities. Midwest's subcontracts provided for progress payments to be made at certain described stages of construction.

In order to obtain financing from American National Bank and Trust Company of Shawnee [Bank or Lender], Midwest assigned to the Bank the proceeds of its subcontracts as security for loans made with the Contractor's knowledge. Under the arrangement, the Bank and Midwest were to be made co-payees of the progress payment checks drawn by the Contractor and sent directly to the Bank.

For its failure to keep the projects free of liens, Midwest's subcontracts were terminated before the final completion of the job. Contractor later sued both Midwest and the Bank,[1] under the provisions of 42 O.S.1971 §§ 152 and 153,[2] for restitution of all progress payments not applied to the discharge of valid lienable claims against the projects.

The original petition alleged, inter alia, that by force of the statutes under consideration Midwest and the Bank became "co-trustees" of all the progress payments made to Midwest. After the Bank's general demurrer came to be sustained, the Contractor appealed. In that appeal [Sandpiper I][3] this court reversed the judgment for the Bank. It held that the funds paid jointly to Midwest and the Bank were impressed with statutory trust because each payment carried with it notice that it represented construction trust funds from the Contractor. Our opinion emphasized that proceeds subject to the § 153 trust, which are in excess of valid lienable claims,[4] are

---

**1.** Also sued were three officers of Midwest and the T.R.G. Trust.

**2.** The terms of 42 O.S.1971 § 152 are:

"(1) The amount payable under any building or remodeling contract shall, *upon receipt by any contractor or subcontractor,* be held as trust funds for the payment of all lienable claims due and owing or to become due and owing by such contractors or subcontractors by reason of such building or remodeling contract.

(2) The monies received under any mortgage given for the purpose of construction or remodeling any structure shall *upon receipt by the mortgagor* be held as trust funds for the payment of all valid lienable claims due and owing or to become due and owing by such mortgagor by reason of such building or remodeling contract.

(3) The amount received by any vendor of real property under a warranty deed, shall, *upon receipt by the vendor,* be held as trust funds for the payment of all valid lienable claims due and owing or to become due and owing by such vendor or his predecessors in title by reason of any improvements made upon such property within four (4) months prior to the delivery of said deed." [emphasis added]

The terms of 42 O.S.1971 § 153 are:

"(1) Such trust funds shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other pur-

pose until all lienable claims due and owing or to become due and owing shall have been paid. (2) If the party receiving any money under Section 152 shall be a corporation, such corporation and its managing officers shall be liable for the proper application of such trust funds." The present versions of §§ 152 and 153 remain unchanged except for the addition of § 153(3) by the 1983 legislature. The provisions of § 153(3) are:

"(3) The existence of such trust funds shall not prohibit the filing or enforcement of a labor, mechanic or materialmen's lien against the affected real property by any lien claimant, nor shall the filing of such a lien release the holder of such funds from the obligations created under this section."

Statutory citations in the text are to the sections of Title 42 in their pre-1983 version.

**3.** *Sandpiper North Apartments, Ltd. v. American National Bank of Shawnee,* Okl., 600 P.2d 332 [1979].

**4.** The sole issue addressed in *Sandpiper I,* supra note 3, was whether the Bank could be proceeded against under §§ 152 and 153 for restitution of diverted trust funds. The sufficiency of contractor's allegations to support this statutory claim was not in dispute. A settled-law-of-the-case doctrine operates to bar relitigation of only those issues that have been settled by an appel-

unaffected by the statutory trust fund doctrine. The Bank was the only defendant to appear and respond on remand.[5] After a bench trial the court found that (1) by checks payable to both of them, the Bank and Midwest received $712,986.61 in trust funds to be applied, pursuant to § 152, to the payment of valid lienable claims; (2) the Contractor was compelled to satisfy unpaid valid lien claims of Midwest in the total amount of $148,079.32; (3) computed at 6% per annum, the interest accrued on these claims to date of the judgment below amounted to $5,371.09; and (4) the Bank and Midwest both diverted from the trust res in excess of $153,450.41 for payment of expenses that were not valid lienable claims.

The trial court then ruled that (1) vis-a-vis the Owners, Contractor and the lien claimants of Midwest, the Bank and Midwest were "co-trustees" of all the progress payments made to them; (2) the Bank and Midwest violated a fiduciary duty by their failure to pay from the statutory construction trust fund valid lienable claims in the total sum of $153,450.41; (3) the Contractor was entitled to restitution from the Bank and Midwest in the amount of $153,450.41, with 12% postjudgment interest. Also awarded to the Contractor was an attorney's fee of $30,000.

On its appeal the Bank contended that (1) the construction trust fund statutes may not be invoked to impose liability upon a subcontractor's lender; (2) the trial court's finding of a wrongful diversion by the Bank of over $153,450.41 is not supported by the evidence; and (3) attorney's fees are not recoverable in a suit brought to enforce the §§ 152 and 153 liability.

Contractor, who brought a separate appeal, urged that (1) the trial court erred in failing to find an additional wrongful diversion from the trust res of $54,200; (2) the amount of prejudgment interest should have been $81,624.43, rather than $5,371.09, with 6% interest added upon the excluded sum of $54,200. Owners did not appeal.

Both appeals were consolidated for disposition by a single opinion. The Court of Appeals affirmed the trial court's decree of restitution as well as its order awarding an attorney's fee. On consideration of petitions by both the Contractor and the Bank, certiorari was granted to settle important first-impression issues of the statutory construction trust fund law.

## I

## THE CONSTRUCTION TRUST FUND STATUTES MAY BE INVOKED TO IMPOSE LIABILITY UPON PERSONS NOT SPECIFICALLY CHARGED THEREIN WITH FIDUCIARY RESPONSIBILITY

The express purpose of the §§ 152 and 153 trust device is to prevent the use of construction-generated funds for any purpose other than payment of valid lienable claims.[6] These sections of the statute not only safeguard the rights of lien claimants on the job but also protect an owner, contractor, subcontractor, or other beneficiary from exposure in excess of the contract limit.[7] All obligees with lien rights are thus shielded from improper disbursement

late opinion. *Berland's Inc. of Tulsa v. Northside Village Shopping Center, Inc.,* Okl., 447 P.2d 768, 774 [1968]; *Carter Oil Co. v. Eli,* 164 Okl. 273, 23 P.2d 985, 992–994 [1933]. We find nothing in the course of antecedent decisional process that operates finally to settle the dispositive issues *now* before us. The Bank is hence not barred from claiming in this appeal that it *did not* occupy a "co-trustee status". See *Mobbs v. City of Lehigh,* Okl., 655 P.2d 547, 549 [1982].

5. Midwest and T.R. Garretson, as trustee for the T.R.G. Trust, failed to appear and were ad-

judged to be in default. The Contractor dismissed, without prejudice, two officers of Midwest, Robert and Sue Morrow, who were parties-defendant below. The third officer of Midwest, Dale Morrow, then already deceased, remains a party to the suit.

6. See footnote 2, supra, § 153(1).

7. *Swan Air Conditioning Co. v. Crest Construction Corp.,* Okl.App., 568 P.2d 1330, 1335 [1977].

of funds paid for their benefit.[8] Subsections (1), (2) and (3) of § 152 mention three classes of payment recipients in whose hands the proceeds of any building contract, mortgage, or warranty deed stand impressed as trust funds. These classes include any contractor or subcontractor, mortgagor or vendor. Although § 152(1) does direct *how* the trust funds shall be used, the statute does not explicitly identify the parties *who* are charged with the duty properly to apply the money. The Contractor contends that § 153(2) extends fiduciary responsibility to "any party receiving any money". We disagree. This subsection does no more than clarify the scope of liability borne by the parties who are named in § 152.

The Legislature's intent doubtless was that the named recipients be charged with a fiduciary duty over construction funds. The term "recipient", within the context of these enactments, denotes one who is in control of the trust funds and is thus able to effect their disbursement. The attributes of control make the statutory recipient a *trustee ex lege*. If some person *other than* a statutorily identified recipient is found to have *actually exercised* control over disbursement of *any* money, knowing it to be a part of the trust funds, that person may be regarded *pro tanto* as an involuntary trustee. But the mere fact that one *other than* a statutory trustee is actually able, or has the opportunity, to control the application of some or all trust funds is *alone* insufficient to cast that person in the role of involuntary trustee. The involuntary trustee status may be imposed only on one who knowingly *takes charge* of the trust res, or any of its parts.[9]

A lender may thus become liable *qua* trustee of a construction trust res over which it assumed to exercise control and from which money came to be wrongfully diverted or misapplied. One who, though not a trustee *ex lege*, stands liable *qua* trustee for misapplied fiduciary funds is known in equity jurisprudence as an involuntary trustee or trustee *de son tort*.[10]

When the lender either knows or should have known that repayment from the borrower (a) is derived from a statutory construction trust fund and that (b) it constitutes an unauthorized or improper expenditure from that fund, the lender is liable in restitution for the amount received. But *mere* acceptance of the borrower's unauthorized repayment will not subject the lender to liability *qua* involuntary trustee for *any sums* diverted from the fund by its statutory trustee to the credit of other improper recipients.[11]

Although the Bank was both a co-payee of the Contractor's checks as well as assignee of their proceeds, this *alone* is not indicative of the Bank's control over the funds and will not suffice to impose upon it the status and liability of involuntary trustee.

## II

### THE BANK'S STATUS AS INVOLUNTARY TRUSTEE OF THE STATUTORY CONSTRUCTION TRUST FUND

A. *The Bank's Liability in Restitution for Excessive Receipts from the Trust Fund in Repayment of the Sandpiper Notes*

Under the terms of its assignment to the Bank, Midwest agreed that all or

---

**8.** *Bohn v. Divine,* Okl.App., 544 P.2d 916, 920 [1975].

**9.** It is a familiar rule of equity that property wrongfully diverted from a trust will be pursued and its restitution compelled. This concept may be called the "trust pursuit rule" or the "rule of trust pursuit". *Independent Coal & Coke Co. v. United States,* 274 U.S. 640, 647–648, 47 S.Ct. 714, 717, 71 L.Ed. 1270, 1277–1278 [1926].

**10.** The terms *de son tort, ex maleficio,* constructive, involuntary or implied trustee are all synonyms. *Davis v. National Bank of Tulsa,* Okl., 353 P.2d 482, 488 [1960].

A wrongful transfer of trust funds to one who takes them with knowledge of their source gives rise to a constructive trust in the res. *Phillips v. Ball,* Okl., 358 P.2d 193, 197 [1961].

**11.** *Aetna Casualty & Surety Co. v. Local Bldg. & Loan Ass'n,* 162 Okl. 141, 19 P.2d 612, 615, 86 A.L.R. 526 [1933]; see also *New Amsterdam Casualty Co. v. First Nat. Bank,* 154 Okl. 74, 6 P.2d 779, 783 [1932].

part of the proceeds from the Contractor's checks would first be applied to payment upon Midwest's notes for the Sandpiper projects. The agreement required that checks from the Contractor be made payable jointly to Midwest and the Bank. On endorsing the checks from Contractor, Midwest is deemed to have received them.[12] In this manner Midwest became a trustee *ex lege* or statutory trustee of all progress payments received.[13] As a subcontractor who performed labor and provided material on the Sandpiper projects, Midwest occupied the status of a lien claimant, and thus it, too, was a beneficiary of the statutory trust fund in its hands. When Midwest— while acting in its dual capacity of trustee and beneficiary—allowed trust funds to be used in repayment of the Sandpiper notes, although valid lienable claims, *other than its own*, remained to be satisfied, it did breach its fiduciary obligation, but only to the extent that the payments to the Bank, when made, may have exceeded the amount of valid lienable claims then in existence in favor of Midwest *in its own behalf* as an individual claimant on the projects.[14] In short, Midwest could repay the Bank, out of the trust fund in its hands, no more than the amount which it might rightfully pay *itself*. Any disbursements made to the Bank in sums greater than the

amount Midwest was entitled to keep as a lien claimant on the projects did indeed constitute a wrongful diversion or misapplication of trust funds. While the evidence does tend to indicate that the Bank knowingly accepted trust funds in repayment of Midwest's Sandpiper notes, it is far from clear that the sums received by the Bank were at any time in excess of Midwest's own lienable claims.

B. *With Respect to the Money used by Midwest in Repayment of the Bank's Loan Advances upon the Sandpiper projects, the Contractor Waived His Right to Seek Recourse Against the Bank for Knowingly Receiving Misapplied Trust Funds.*

When Midwest's trust funds reached the point of exhaustion, Contractor was compelled to satisfy certain unpaid claims to keep the projects lien-free. This was required by the Contractor's assumed contractual obligation to the Owners. Although one in the Contractor's legal position doubtless may claim restitution for misapplied progress payments, the various factors present here impel our conclusion that in *this case* Contractor waived the right to proceed against the Bank for resti-

---

**12.** *Anchor Concrete Co. v. Victor Savings & Loan Association,* Okl., 664 P.2d 396, 399 [1983]. In *Anchor* we followed the joint-payee check rule of *Post Bros. Const. Co. v. Yoder,* 20 Cal.3d 1, 569 P.2d 133, 141 Cal.Rptr. 28 [1977], where it was held: "... [w]hen a subcontractor and his materialmen are joint payees, and no agreement exists with the owner or general contractor as to allocation of proceeds, the materialman by endorsing the check will be deemed to have received the money due him ..." We especially note that the co-payees in *Anchor* were both lien claimants. In the instant case the Bank was not a lien claimant but a mere endorser of the jointly payable checks by virtue of its status as assignee of the proceeds. Our language in *Anchor*—with respect to subcontractor's obligations under the construction trust fund statutes—does not operate here to create any liability against the Bank as a mere creditor of a subcontractor. The Bank's status is discussed in Part II C of this opinion. See also footnote 14, infra.

**13.** See *McGlumphy v. Jetero Construction Co., Inc.,* Okl., 593 P.2d 76, 82 [1978]. In that case we held that when a subcontractor receives a progress payment from a contractor, the subcontractor is *pro tanto* obligated to disburse it for the payment of valid lienable claims on the construction project that generates the proceeds.

**14.** Valid lienable claims were due during all the relevant periods and were known to exist by both Midwest and the Bank. As assignee and/or co-payee of checks constituting trust funds, the Bank did *not* and could *not* acquire rights either equal or superior to those of a valid lien claimant to the funds. *Cf. Swan Air Conditioning Co. v. Crest Construction Corp.,* supra note 7 at 1334. A lien claimant has a statutory charge upon that property on which labor was performed or for which material was furnished. 42 O.S.1981 §§ 141 et seq.; *Bohn v. Divine,* supra note 8 at 920; *Jackman v. Eau Claire National Bank,* 125 Wis. 465, 104 N.W. 98, 106 [1905].

tution of Midwest's excessive repayments, if any made, on the Sandpiper projects.[15]

The factors which operate to alter the Contractor's legal position vis-a-vis the trust funds in Midwest's hands are: (1) The Contractor knew that (a) the Bank was financing Midwest's performance of its Sandpiper subcontracts because progress payments were to be made not in advance but for completed stages of work, and that (b) subcontract proceeds were assigned as collateral for the loans; (2) The Contractor agreed to and did draw checks of which Midwest and the Bank were co-payees and sent them *directly* to the Bank. All this manifests the Contractor's acquiescence in, if not explicit consent to, the assignment of the proceeds to the Bank; (3) Since the progress payments were all made pursuant to construction contracts, the Contractor knew, or should have known, that progress payments constituted trust funds to be applied in payment of valid lienable claims; (4) The Contractor knew, or should have known, that, without assigning to the Bank its claim to payment on Sandpiper projects, Midwest could not have obtained the necessary financing, and that the trust funds, once in Midwest's hands, would first be applied to repay the Sandpiper notes; and (5) The Contractor knew that Midwest had contracted with suppliers for building materials needed on the projects and hence knew, or should have known, that some of the money lent by the Bank would not only be used to satisfy Midwest's own lienable claims but also those of its suppliers.[16]

In sum, the Contractor's knowledge, coupled with his voluntary acts of cooperation in the transfer of progress payments to the Bank, amounts to a waiver of the right strictly to enforce Midwest's statutorily imposed fiduciary responsibility insofar as trust funds were used to repay the Sandpiper notes. We therefore hold that resort to the trust fund to satisfy those notes, if in excess of Midwest's own valid lienable claims, did *not* constitute, *as between the Contractor and the Bank*, a misapplication or wrongful diversion of the trust res.[17] Were it not for the waiver the Bank would be liable to the Contractor for *all* repayments by Midwest which exceeded the amount of Midwest's own lienable claims.[18]

## C. *The Bank's Assumption of Control over the Trust Funds*

During the early months of operations the Bank's involvement with Midwest's trust funds was limited to making sure that Sandpiper notes were repaid before new credit came to be extended. On occasion it made sure that a few of Midwest's suppliers were being paid.

When difficulties first arose during the Spring of 1972, Midwest was having cash flow management problems and the Contractor did not always timely send its

15. A waiver is defined as the voluntary or intentional relinquishment of a known right. The party invoking it as a bar is required to show that the person against whom the bar is asserted did, at the time of the transaction, have knowledge, actual or constructive, of the existence of his rights and of all the material facts upon which they depended. No one can be bound by a waiver of one's rights unless it was made with full knowledge of the rights intended to be waived. *Faulkenberry v. Kansas City Southern Ry. Co.*, Okl., 602 P.2d 203, 207 [1979].

16. The terms of 25 O.S.1981 § 13 provide: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself."

17. Our holding here does not limit the restitution remedy of anyone whose claim is found to be unimpaired by waiver. See *Smith v. Minneapolis Threshing Machine Co.*, 89 Okl. 156, 214 P. 178 [1923].

18. The defense of waiver was available to the Bank, even though it had not been plead. Our chancery practice does not require strict conformity to the strictures of pleading. In *Harrison v. Perry*, Okl., 456 P.2d 512, 513 [1969] we held: "Equity, having once attached, in a proper proceeding, *will administer complete relief on all questions properly raised by the evidence regardless of whether or not such question or issues are specifically raised by the pleadings*, as equity will not permit a mere form to conceal the real position and substantial rights of the parties." [emphasis ours]

checks. Several of them were for less than the amount billed. Because less money went toward payment on the Sandpiper notes, the Bank recommended, in July of 1972, that Midwest employ T.R. Garretson to oversee the money outflow. By September, at the Bank's insistence and as a condition precedent to making further loans, Garretson was placed in complete charge of progress payment receipts on the Sandpiper projects.[19] Garretson worked closely with the Bank's officers, and sometime in September or October informed them of several outstanding bills of Midwest. Some materialmen even contacted the Bank to let it know of their outstanding claims.

In November of 1972 the Contractor began receiving calls from claimants about Midwest's unpaid bills, some of which the Contractor satisfied before any liens were filed. By this time, Midwest's financial difficulties were so acute that the Bank became directly involved in the disbursement of trust funds for the Sandpiper projects. Garretson and a bank officer directed each disbursement, and a significant portion of the funds were used to pay bills incurred on the projects rather than in repayment of notes. Later, proceeds were no longer applied to any notes, but instead were used only to pay off lienable claims. The evidence also shows that funds from unidentified sources other than the Contractor were applied to the Sandpiper claims.

By April of 1973 Midwest became defunct, with its building, inventory and records abandoned. The Bank foreclosed its liens and took complete control. The Contractor continued to send checks until April of 1973. In July all contracts with Midwest came to be terminated.

Many lenders commonly monitor certain customers, particularly when the risk seems high or when the interest in the debtor's operations appears substantial. We do not think that when Garretson was hired by Midwest upon the Bank's recommendation the Bank then assumed the control of the trust funds *qua* trustee even though future advances by the Bank were made dependent on Midwest's compliance with certain requirements and the Bank insisted that Garretson remain in complete charge of Sandpiper operations. It was not until Garretson could no longer disburse funds without first conferring with one of the Bank's officers that the Bank began to exercise that quantum of control which cast it in the role of involuntary trustee. We accordingly hold that the trial court was correct in imposing upon the Bank the liability of an involuntary trustee, but, for reasons to be explained in Part III of this opinion, we must reverse the restitution decree and remand the cause for a specific finding on the point in time when the Bank became an involuntary trustee of the construction fund and on the amount of misapplied funds during the period the Bank exercised control as trustee.

### III

### THE TOTAL AMOUNT OF MISAPPLIED FUNDS WAS NOT CORRECTLY DETERMINED

On appeal of an equity suit[20] the evidence will be weighed, and if the trial court's decree is clearly against its weight, such judgment will be rendered or ordered rendered as the trial court should have rendered.[21] The elements of proof in a cause of action founded upon §§ 152 and 153, laid down by the pronouncement in

**19.** Garretson had also worked for other bank customers that had experienced financial difficulties.

**20.** A lien foreclosure is an equitable proceeding, *Spartan Petroleum Corp. v. Curt Brown Drilling Co.,* Okl., 446 P.2d 808, 811 [1968], *Moral Insurance Co. v. Cooksey,* Okl., 285 P.2d 223, 227 [1955]; construction trust funds are deemed an

integral part of the Oklahoma lien law, *McGlumphy v. Jetero Construction Co.,* supra note 13 at 84; and trusts are a long-recognized institution of equity jurisprudence, *Goldrick v. Roxana Petroleum Co.,* 74 Okl. 55, 176 P. 932, 934 [1918].

**21.** *Snow v. Winn,* Okl., 607 P.2d 678, 680 [1980].

*Bohn v. Divine,*[22] are: (1) the trustee received trust funds, (2) not all valid lienable claims were paid and (3) trust funds were applied to a purpose other than payment of valid lienable claims. We discussed the first and second elements earlier in this opinion and now consider the third.

▄▄▄ The plaintiff *must* show that trust funds were applied to purposes other than payment of valid lienable claims. The question before us here is (a) whether a strict burden should be placed on the plaintiff to establish the object of each misapplication or (b) whether the plaintiff need only show the amount of unaccountable trust funds and the existence and extent of valid lienable claims that remain unsatisfied. We hold that either method of proof will satisfy the statute. To impose the stricter *onus* without affording the plaintiff the option of showing unaccountable funds, would place too heavy a burden upon the restitution claimant, particularly where the defendant-trustee kept insufficient records.[23] Upon a showing that valid lienable claims remain unsatisfied and that trust funds are either unaccountable or have been applied to purposes other than payment of valid lienable claims, a restitution plaintiff establishes a prima facie claim for misapplication.

While it is not entirely clear from the terms of the judgment, the record reveals two possible evidentiary sources upon which the trial court may have rested its conclusion that trust funds were misapplied. The first source consists of the amount of proceeds applied to Sandpiper notes. Our holding, in Part II, that the Contractor waived his right to enforce the trust as to that diversion, precludes, on remand, consideration of this source as evidence of misapplication. The second possible source of evidence could have been derived from the testimony of a certified public accountant who audited the records of Midwest. The results of that audit show that over $722,000 was expended by Midwest on the Sandpiper projects. The trust funds admittedly totaled $712,986.61. About $250,000 of the $722,000 was concededly based upon "accounting assumptions", although part of the $250,000 appears to actually encompass the payroll expenditures of Midwest for all its operations. The portions of the payroll attributable only to Sandpiper projects were not established, but despite this uncertainty, the evidence reflects that some portion of the $250,000 was expended by Midwest for labor and possibly materials used on the Sandpiper projects.

The trial court found that funds in excess of $148,079.32 were misapplied.[24] This amount, we note, is the same as that which the Contractor paid to discharge valid lienable claims that were not satisfied by the trustee. Liens were later filed on some of those claims.

▄▄▄ The mere fact that the Contractor satisfied valid lienable claims is not *per se* evidence of misapplication. The trial court must specifically determine the extent of misapplied funds based on the alternative methods of proof which may be used to demonstrate the amount thereof, i.e. unaccountability of trust funds or application of them for purposes *other* than payment of valid lienable claims. The Contractor's total recovery in restitution *must* be limited to whichever of these two amounts is found to be lower—the amount of misapplication shown by the proof or the amount of valid lienable claims which Contractor had to satisfy in order to keep the projects lien-free.

The Contractor urges that the trial court should have found that an additional $54,000 was misapplied. This amount was derived from the Bank's liability ledger sheet

22. See footnote 8, supra, 544 P.2d at 920.

23. This is in keeping with the general trust principle that where a trustee fails to keep proper trust records, all doubts are resolved against him in proceedings to compel a proper accounting. *Finley v. Exchange Trust Co.,* 183 Okl. 167, 80 P.2d 296, 300 [1938].

24. The trial court added prejudgment interest of $5,371.09 to this figure to reach a total of $153,450.41.

by the Contractor's accounting expert who testified that the amount was applied to Midwest's notes not involving the Sandpiper projects. Since we cannot tell whether the trial court considered this proof as a misapplication, we will not now do what the trial court should have done—make a specific determination as to whether this amount may have been misapplied. In order to ascertain any liability of the Bank, the trial court must determine the extent of misapplication, if any, which occurred after the Bank became an involuntary trustee.

Because these specific findings were not made below,[25] we must reverse insofar as the decree determines the amount which has been wrongfully diverted from the trust funds and remand this cause for further proceedings to be conducted in accordance with the principles pronounced herein.

## IV

### PREJUDGMENT INTEREST WAS IMPROPERLY AWARDED TO THE CONTRACTOR

The Contractor contends that the trial court incorrectly determined the amount of prejudgment interest. He seeks an amount greater than that awarded below. The Bank argues that it is immaterial whether the interest was properly calculated because the Contractor is not, as a matter of law, entitled to *any* prejudgment interest.

 The applicable statute, 23 O.S. 1981 § 6, provides that:

"Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt."

The general rule is that prejudgment interest will not be allowed unless the amount of recovery is liquidated or capable of ascertainment by calculation or resort to well-established market values.[26] In the instant case, the amount to which the Contractor may be entitled for misapplication of trust funds is neither certain nor capable of being made certain until after trial. The Contractor was not entitled to an award for prejudgment interest. That portion of the decree is also reversed.

## IV

### ATTORNEY'S FEES ARE PROPER UNDER THE CONSTRUCTION TRUST FUND STATUTES

The Bank contends that Oklahoma law does not allow recovery of attorney's fees unless the pertinent statute or contractual arrangements authorize it. Since the present action, the Bank argues, is essentially one for conversion, attorney's fees may not be recovered.

 We cannot agree. Inasmuch as the construction trust fund statutes are an integral part of Oklahoma's lien law, we have held that the prevailing party may recover unreasonable counsel fees in an action to enforce such trust.[27] Because in the instant case the trial court must yet make the necessary determination as to whether trust funds were misapplied, the attorney's fee award to the Contractor must be set aside. Assessment of attorney's fees is a proper issue to be considered on remand after retrial.

The trial court's decree of restitution is reversed in part and affirmed in part; the causes are remanded with directions: (1) to determine when the Bank became an involuntary trustee and whether, and to what extent, money was misapplied from the trust fund after the Bank's assumption of

**25.** *Davis v. Gwaltney*, Okl., 291 P.2d 820, 824 (1955).

**26.** *City of Chickasha v. Hollinsworth*, 56 Okl. 341, 155 P. 859 [1916]; *American Eagle Fire Ins. Co. v. Lively*, 142 Okl. 246, 286 P. 797, 798 [1930]; *Lumbermen's Supply Co. v. Neal*, 189 Okl. 544, 199 P.2d 1017, 1019 [1941]; *Allison v. Allen*, Okl., 326 P.2d 1059, 1063 [1958]; *Smith v. Owens*, Okl., 397 P.2d 673, 683 [1965]; *Frankfurt v. Bunn*, Okl., 408 P.2d 785, 789 [1965].

**27.** *McGlumphy v. Jetero*, supra note 13 at 84; 42 O.S.1981 § 176.

trustee status, and (2) to resolve any other issues that may arise on remand.

BARNES, C.J., LAVENDER and HARGRAVE, JJ., and MEANS, S.J., sitting by assignment for KAUGER, J., who disqualified, concur.

SIMMS, V.C.J., concurs in judgment.

WILSON, J., concurs in part and dissents in part.

HODGES, J., dissents.