**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 3 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MANNING & SMITH INSURANCE,
INC., a Kansas corporation,

      Plaintiff-Appellant
      Cross-Appellee,

v.

HAWK-MORAN INSURANCE
AGENCY, INC., dba Hawk-Moran
Insurance, Inc.; H. THOMAS
MORAN, an individual; VICTORIA
MORAN, an individual; WILLIAM K.
HAWK, an individual; MAXIE
HAWK, an individual,

      Defendants-Appellees
      Cross-Appellants.

No. 98-6311 and 98-6321

(D.C. No. CIV-97-990-L)
(W.D. Okla.)

---

**ORDER AND JUDGMENT** *

---

Before **EBEL** , **McWILLIAMS** , and **BRISCOE** , Circuit Judges.

Plaintiff Manning & Smith Insurance, Inc. (MSI) appeals from the district

court's judgment, entered after a bench trial, on its claim for damages arising out

---

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of defendants' breach of an agreement to purchase MSI's share in an insurance agency. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, deny defendants' motion to dismiss MSI's appeal, and affirm the district court's judgment in its entirety.

## I.

MSI is a Kansas corporation with its principal place of business in Wichita. Defendant Hawk-Moran Insurance Agency, Inc. (Hawk-Moran) is a suspended Oklahoma corporation which at all material times had its principal place of business in or near Oklahoma City. Defendants H. Thomas Moran (Moran), Victoria Moran, William K. Hawk (Hawk), and Maxie Hawk, the owners of Hawk-Moran, are all Oklahoma citizens.

On August 4, 1993, MSI and Hawk-Moran entered into a written purchase agreement whereby MSI agreed to sell, and Hawk-Moran agreed to buy, MSI's 66.67% partnership interest in Moran & Smith Insurance (Moran & Smith), an Oklahoma partnership engaged in the business of insurance sales. The total purchase price was $319,000. The written purchase agreement negotiated and signed by the parties specifically allocated the purchase price to the following individual items: (1) $7,500 for "Insurance Expirations"; (2) $130,000 for a covenant not to compete; (3) $175,500 for commissions on existing insurance business; (4) $5,000 for miscellaneous office equipment, furniture, etc.; and (5)

2

$1,000 for "the name Moran & Smith Insurance and good will." App. at 4-5.

At the time of the sale, a large share (approximately 25.5%, or $149,592) of Moran & Smith's total annual commissions came from the account of client All-American Bottling (All-American). Due to the importance of the All-American account to the value of the business, the parties included a special section in the purchase agreement covering that account. In particular, Section 6.1 of the agreement provided, in pertinent part, as follows:

> The net of all commissions of Buyer earned on the account of All-American shall not average less than $149,592 per year for the forty-two (42) month term of this Agreement. Such average net income per year shall be computed at the end of each year. In the event of breach of this warranty because the average net income per year from All-American is less than $149,592, Buyer may, at Buyer's option, reduce the amount of each subsequent monthly payment by the following formula:
> Total Agency base commission is $586,483.
> Percent of Book is $149,592 ÷ by $586,483 - .255
> Thereafter each payment will be reduced by 25.5%.
>
> In the event of the breach of this warranty, Buyer shall calculate and furnish to Seller:
> 6.1.1 Adjusted Purchase Price. The adjusted purchase price, recalculated as of such date, by reducing the unpaid balance of the purchase price by the amount of Seller's liability under the immediately preceding paragraph; and
> 6.1.2 Adjusted Schedule of Payments. A new schedule of payments based upon the recalculated purchase price.

Id. at 6-7.

Hawk-Moran made an initial payment to MSI of $10,523.79 at the time the parties entered into the purchase agreement, and agreed to make 41 monthly

3

payments of $7,523.81. In addition, the individual owners of Hawk-Moran signed a written guaranty in favor of MSI for the total purchase price.

Hawk-Moran made the scheduled monthly payments through July 1995. On August 8, 1995, Hawk-Moran's bookkeeper, Dayna Voyles (Voyles), sent a letter to MSI indicating that the annual commissions received from All-American during the first two years of the agreement ($144,486.01 for the period from August 1993 through July 1994, and $117,763.03 for the period from August 1994 through July 1995) had dropped below the figure warranted in Section 6.1 of the purchase agreement. Accordingly, Voyles indicated that Hawk-Moran was exercising its rights under Section 6.1 and reducing the payment amounts required under the agreement. More specifically, Voyles provided the following, recalculated payment amounts:

> For the period of 8/1/93 thru 7/31/94, using the calculation stated in the Agreement of $144,486.01 ÷ 586,483 = .00871, we came up with the new payment figure of $10,432.13 for the down payment and $7,458.28 for the subsequent eleven payments. For the period of 8/1/94 thru 7/31/95, using the calculation of $117,763.03 ÷ 586,483 = .05427, we figured $7,115.49 for all twelve payments.

Id. at 114. On August 16, 1995, Voyles sent MSI a follow-up letter further outlining the methodology she employed in recalculating the payments due under the agreement.

Hawk-Moran made payments to MSI in August and September 1995 pursuant to the recalculated payment schedule. Thereafter, however, Hawk-

4

Moran encountered financial difficulties and made no further payments under the agreement. In April 1996, Hawk-Moran asked MSI to recalculate the payment amounts to comport with a further reduction in the amount of commissions received from the All-American account since August 1995 (the annual commissions generated from the account had apparently dropped to approximately $70,000). MSI complied and, using the methodology previously employed by Voyles, determined that the remaining payments due under the agreement (October 1995 through December 1996) would be $6,503.58 each.

Hawk-Moran made no further payments to MSI. After attempting to informally settle the matter, MSI filed this diversity action on June 19, 1997. Moran filed a counterclaim against MSI, seeking an accounting of premiums received by MSI and judgment for all amounts owed by MSI to Moran as a result of such accounting. On May 29, 1998, the district court granted partial summary judgment in favor of MSI "on the issue of whether defendant Hawk-Moran . . . breached the Purchase Agreement by failing to make scheduled payments to plaintiff." Id. at 49. The district court concluded, however, that genuine issues of material fact existed "with respect to offsets to which defendants may be entitled." Id. Accordingly, it declined to grant summary judgment in favor of MSI with respect to the issue of damages.

After a bench trial, the district court concluded that the payment amounts

recalculated by MSI in April 1996 were consistent with the terms of Section 6.1 of the agreement, and that, accordingly, the unpaid installments under the agreement totaled $96,329.88. The court further found that MSI was "entitled to contractually mandated late fees of $15,000.00." Id. at 84. The district court found that Hawk-Moran was "entitled to [a credit of] $7,697.89 for commissions and premiums that it ha[d] earned and that MSI ha[d] withheld." Id. The district court also found that Moran had brokered a major account for MSI in 1996 (the Southern Hospitality Group account), was entitled to "50 percent of the commissions and premiums from that account from the date written through the life of the policies," and was thus entitled "to a set-off of $39,426.58." Id. at 85-86. Based upon these figures, the district court entered judgment against Hawk-Moran and in favor of MSI in the amount of $64,205.41, plus post-judgment interest. The court rejected MSI's request for prejudgment interest.

MSI now appeals, challenging the district court's finding that Hawk-Moran was entitled to half of the commissions and premiums from the Southern Hospitality Group (Southern Hospitality) account, as well as the district court's decision not to award prejudgment interest. Defendants have moved to dismiss MSI's appeal. Defendants have also filed a cross-appeal challenging the district court's finding regarding the total amount of unpaid installments under the agreement.

6

II.

*Motion to Dismiss*

Prior to filing their appellate brief, the Hawks moved to dismiss MSI's appeal on the grounds that MSI had failed to forward to Moran his 50% share of the 1998-99 commissions attributable to the Southern Hospitality account. According to the Hawks, MSI must have accepted the district court's judgment and applied Moran's share of the commissions "to the debt established by the Trial Court's Judgment." Motion to Dismiss at 4. In short, the Hawks argue, MSI "has accepted the benefit of the Trial Court's Judgment and thereby waived its right to prosecute" its appeal. Id. at 1.

We reject the Hawks' arguments. Although it is true under Oklahoma law that "any act by an appellant that recognizes the validity of a judgment . . . operates as a waiver of the appellant's right to appeal from the judgment," Robert L. Wheeler, Inc. v. Scott, 818 P.2d 475, 477 (Okla. 1991), MSI has done nothing here to recognize the validity of the district court's judgment. As discussed in greater detail below, MSI is challenging on appeal the district court's determination that Moran is entitled to 50% of the commissions and premiums derived from the Southern Hospitality account. Thus, MSI's retention of all of the commissions and premiums is entirely consistent with the arguments it asserts on appeal, and cannot be reasonably construed as an acceptance of the district

7

court's judgment.[1]

MSI suggests in its response to the motion to dismiss that the Hawks and their counsel should be sanctioned under 10th Cir. R. 46.5. Rule 46.5 provides, in part, that the court "may impose . . . an appropriate sanction" upon a party and/or their counsel if they file any motion that is not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law." Although the Hawks' motion to dismiss does, in fact, border on the frivolous, we choose not to impose a sanction upon the Hawks.

*MSI's Appeal*

*A. Existence of a brokerage agreement between MSI and Moran*

MSI contends the district court erred in finding that MSI entered into a brokerage agreement with Moran concerning the Southern Hospitality account, under which the district court concluded Moran was entitled to 50% of the commissions and premiums generated from the account. According to MSI, it never reached any agreement with Moran concerning the Southern Hospitality account. Further, MSI asserts Moran is entitled, at most, to a one-time referral or "finder's" fee because the only work he performed in connection with the

---

[1] The only other option available to MSI, i.e., paying 50% of the Southern Hospitality commissions to Moran, would clearly constitute an acceptance of the district court's judgment and obviate the appeal.

Southern Hospitality account was referring it to MSI.

Under Oklahoma law, "the existence of an implied contract generally presents an issue of fact." Russell v. Board of County Comm'rs, 952 P.2d 492, 502 (Okla. 1997); see also Coston v. Adams, 224 P.2d 955, 961 (Okla. 1950) ("where an oral contract is to be gathered from talks between the parties, and especially from talks on more than one occasion, . . . the question as to what the contract was, if controverted, must usually be tried . . . as a question of fact"); Taylor v. Cobb, 214 P.2d 233, 237 (Okla. 1950) (holding, in action to recover a broker's commission, "conflicting evidence on the terms of the alleged contract or agreement presented a question of fact for the jury to determine"); Conservation Oil Co. v. Graper, 46 P.2d 441, 445 (Okla. 1935) (suggesting existence of contract is a factual issue). Accordingly, we review the district court's findings regarding the existence and nature of the contract between MSI and Moran only for clear error.

At trial, the parties essentially agreed that, under industry practice, a "brokered account" or "brokerage agreement" is created when one insurance agent refers a client to a second insurance agent so that the client can take advantage of policies offered by the second agent that are not available to the first agent. App. at 311, 331, 337. Although it is common for both agents in the arrangement to perform services for the client, the evidence indicated that is not

9

always the case. Indeed, both Hawk and Moran testified that a brokerage agreement can be created even where the first agent performs little or no services for the client. Id. at 331-33, 356, 361-62. Once a brokerage agreement is created, the two agents evenly split the commissions and premiums generated from the policy entered into by the client. Id. at 317, 323, 330.

Between 1993 and 1997, MSI and Moran regularly placed brokered accounts with each other and, consistent with industry practice, evenly split the commissions and premiums generated from those accounts. Id. at 85. At no time did MSI and Moran enter into any alternative arrangements regarding accounts referred to each other. Id. at 357. Prior to the fall of 1996, Moran had established both a social and a business relationship with Bob Slater, the owner of Southern Hospitality. Id. at 358. In October 1996, Moran apparently learned from Slater that Southern Hospitality's insurance policies were set to expire at the end of November 1996. Accordingly, in an effort to offset his debt to MSI arising out of the purchase agreement, Moran contacted MSI and suggested they submit a bid for Southern Hospitality's account. Id. at 359-60. During his discussion with MSI, Moran talked about splitting any commissions received from Southern Hospitality on a 50/50 basis. Id. In response, MSI's representative did not specifically agree, but instead stated: "[L]et's try and get the account." Id. at 343, 361. Moran subsequently arranged for, and participated in, two meetings with

10

MSI and Southern Hospitality. Id. at 359. As a result of these meetings, MSI prepared and submitted a bid that was accepted by Southern Hospitality. Id. at 342.

Based upon this evidence, we conclude the district court's findings regarding the existence and nature of the agreement between MSI and Moran are not clearly erroneous. More specifically, we believe it was reasonable for the district court to conclude, based upon the above-described evidence, that Moran and MSI orally or impliedly entered into a standard brokerage agreement for the Southern Hospitality account.

### B. Denial of prejudgment interest

MSI also contends the district court erred in denying its request for prejudgment interest. The district court rejected MSI's request on the grounds that MSI's "damages were not calculable prior to trial." App. at 86 (citing Transpower Constructors v. Grand River Dam Auth., 905 F.2d 1413, 1422 (10th Cir. 1990)).

We generally review the award or denial of prejudgment interest for abuse of discretion. See Frymire v. Ampex Corp., 61 F.3d 757, 772 (10th Cir. 1995). "However, any statutory interpretation or legal analysis underlying [the district court's decision] is reviewed de novo." Driver Music Co. v. Commercial Union

Ins. Co., 94 F.3d 1428, 1433 (10th Cir. 1996). "A federal court sitting in diversity applies state law, not federal law, regarding the issue of prejudgment interest." Strickland Tower Maintenance, Inc. v. AT & T Communications, Inc., 128 F.3d 1422, 1429 (10th Cir. 1997).

Under Oklahoma law, prejudgment interest is available on "damages certain, or capable of being made certain by calculation." Okla. Stat. Ann. tit. 23, § 6 (West 1999)). "It is well established that a damage award is not certain for purposes of the Oklahoma statute 'unless the amount of recovery is liquidated or capable of ascertainment by calculation or resort to well-established market values.'" Strickland, 128 F.3d at 1429 (quoting Sandpiper North Apartments, Ltd. v. American Nat'l Bank & Trust Co., 680 P.2d 983, 993 (Okla.1984)); see also Marten v. Credit Adjustment Serv., Inc., 349 P.2d 742, 745 (Okla. 1960) ("The word 'liquidated' . . . means made certain as to what and how much is due, either by agreement of the parties, or by operation of law."). "Therefore, if the fact-finder must weigh conflicting evidence in order to determine the precise amount of damages due to the plaintiff, then a court cannot grant prejudgment interest." Strickland, 128 F.3d at 1429 (citing Withrow v. Red Eagle Oil Co., 755 P.2d 622, 625 (Okla. 1988), and Liberty Nat'l Bank & Trust Co. v. Acme Tool Div., 540 F.2d 1375, 1383 (10th Cir. 1976)).

Here, as discussed in greater detail in our analysis of defendants' cross-

12

appeal, Section 6.1 of the purchase agreement was ambiguous regarding the extent to which the purchase payments were to be reduced as a result of the drop in the annual All-American commissions.  Although there is no Oklahoma case law discussing whether the existence of a contract ambiguity renders damages unliquidated, cases from other states suggest that a contract ambiguity does, in fact, render damages unliquidated and eliminate the availability of prejudgment interest.  See Ventura v. Titan Sports, Inc., 65 F.3d 725, 735 (8th Cir. 1995) (applying Minnesota law and noting that "[p]rejudgment interest has been denied where ambiguities in a commission agreement included the length of the required period preceding notice of termination, the exact sales base for the commission and the commission rate"); Super Hooper, Inc. v. Dietrich &  Sons, Inc., 347 N.W.2d 152, 156 (N.D. 1984) (concluding in case brought under North Dakota law, and involving a nearly identical prejudgment interest statute, that if the terms of a contract are ambiguous, a claim is unliquidated and prejudgment interest is not appropriately awarded); cf. Knox v. Cook, 446 N.W.2d 1, 6 (Neb. 1989) (concluding that, because guaranty at issue was unambiguous, the amount due thereunder was liquidated).  Because we predict the Oklahoma Supreme Court would follow these states and hold that a contract ambiguity renders damages unliquidated and eliminates the availability of prejudgment interest, we affirm the district court's decision.  See generally Carl v. City of Overland Park, 65 F.3d

13

866, 872 (10th Cir. 1995) ("In the absence of authoritative precedent from [a state supreme court], . . . our job is to predict how that court would rule.").

*Defendants' Cross-Appeal*

One of the key issues before the district court was the proper interpretation of Section 6.1 of the purchase agreement. As previously noted, MSI warranted in Section 6.1 that the annual commissions received from the All-American account would not drop below a certain level ($149,592). Section 6.1 further provided that, in the event the annual All-American commissions dropped below the warranted level, defendants could ask for a reduction in the purchase price, to be calculated pursuant to a formula set forth in Section 6.1. At trial, defendants argued that, in the event of a breach of the warranty, "Section 6.1 require[d] a 25.5 percent reduction in all installments due after November 1993, regardless of the amount of reduction in All-American commissions." App. at 83. The district court rejected defendants' interpretation, and instead concluded that Section 6.1 "envision[ed] a yearly recalculation of the installment payments based on the average net income received from All-American commissions." Id. at 84. In their cross-appeal, defendants challenge the district court's ruling.

The threshold issue is what standard of review to apply to the district court's interpretation of Section 6.1. Under Oklahoma law, the question of

14

whether a contract is ambiguous is a legal issue for the court. Robinson v. GEICO Gen. Ins. Co., 928 P.2d 971, 973 (Okla. Ct. App. 1996). Thus, we review any such determination de novo. See Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc., 51 F.3d 910, 914 (10th Cir. 1995). Once a contract is determined by the court to be ambiguous, however, evidence of extrinsic facts is admissible and construction of the contract becomes a mixed question of fact and law that is normally decided by the jury (or, in the case of a bench trial, the court). See Hunter's Modern Appliance, Inc. v. Bank IV Oklahoma, 949 P.2d 701, 703 (Okla. Ct. App. 1997). Presumably, where, as here, the district court sits in place of the jury and purports to construe an ambiguous contractual provision, the district court's construction is subject to review under a clearly erroneous standard or a de novo standard, depending upon whether the mixed question involves primarily a factual inquiry or consideration of legal principles. See Naimie v. Cytozyme Lab., Inc., 174 F.3d 1104, 1111 (10th Cir. 1999).

In deciding whether the district court properly interpreted Section 6.1, the initial question, subject to de novo review, is whether the provision is ambiguous. Although Section 6.1 is clear to the extent it provides for some type of purchase price reduction in the event the All-American commissions drop below the warranted level, we conclude it is ambiguous with respect to precisely how much the purchase price is to be reduced. In particular, it is unclear from the

15

contractual language whether all of the subsequent payments are to be reduced by a flat 25.5% amount, as suggested by defendants, or whether, instead, the subsequent payments should be reduced in an amount proportionate to the amount of the All-American commission reduction.

Having concluded that Section 6.1 is ambiguous, the next question is whether the district court properly interpreted Section 6.1 as requiring any payment reductions to be proportionate to the drop in All-American commissions. Because this interpretation involves primarily a factual inquiry, i.e., the parties' intention when they entered into the agreement, it is subject to review only for clear error. See Naimie, 174 F.3d at 1111. Reviewing the portions of the trial transcript included in the record, we conclude the district court's interpretation is not clearly erroneous. The evidence presented at trial demonstrated that, prior to the suit being filed, the parties themselves interpreted Section 6.1 as requiring the payments in any given year to be proportionate to the amount of All-American commissions received by Hawk-Moran. In particular, Hawk-Moran's bookkeeper interpreted Section 6.1 in this manner when, in August 1995, she sent a letter to MSI outlining proposed payment reductions for the years 1993 and 1994. MSI accepted her calculations, and, in March 1996, proceeded to use that same methodology to further lower the contract payments due to additional reductions in All-American commissions. Aside from this evidence, we agree with the

16

district court's conclusion that defendants' proposed interpretation of Section 6.1 "would lead to an absurdity." App. at 84. For example, under the defendants' proposed interpretation, if the All-American commissions dropped merely one dollar below the warranted amount, they would receive a 25.5% reduction in all of the remaining payments. Obviously, it is doubtful the parties originally intended such a result. See generally Altshuler v. Malloy, 388 P.2d 1, 4 (Okla. 1963) (concluding that, in interpreting contract, court must place itself "as far as possible in the position of the parties when the contract was entered into and consider the instrument itself as drawn, its purposes and the circumstances surrounding the transaction, and, from a consideration of all the elements, determine upon what sense or meaning of the terms used their minds actually met").

III.

The motion to dismiss filed by defendants/appellees William K. and Maxie Hawk is DENIED. With respect to both the appeal and the cross-appeal, the judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge